Filed 7/30/13  In re T.A. CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re T.A. et al., Persons Coming Under the Juvenile Court Law. | |
| ALAMEDA COUNTY SOCIAL SERVICES AGENCY,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>ANDREA H.,<br><br>        Defendant and Appellant. | A136820<br><br>(Alameda County<br>Super. Ct. Nos. HJ08011104, HJ08011105) |

Andrea H. (mother) appeals from an order terminating her parental rights and selecting adoption as the permanent plan for two of her daughters. Mother contends the evidence is insufficient to support the court's finding that the beneficial parent-child relationship exception to adoption is inapplicable. (Welf. & Inst. Code, § 366.26, subd. (c)(1)(B)(i).)[1] We find no error and shall affirm.

**Factual and Procedural Background**

On October 24, 2008, the Alameda County Social Services Agency (agency) filed a petition alleging that mother's four children, then ages 3, 6, 8 and 13, came within the provisions of Welfare and Institutions Code section 300. The petition alleged that mother failed to protect her children from her live-in boyfriend who physically abused mother and the two older children and sexually abused the 13-year-old girl.

---

[1] All further section references are to the Welfare and Institutions Code.

1

The petition was sustained on all counts on May 12, 2009, following a contested jurisdictional hearing. At some point, the proceedings were bifurcated and only the two younger children, T.A. and S.A. (both girls), are the subject of the proceedings at issue here. The girls were placed in foster care on May 13, 2009, and mother was provided family reunification services.

At the October 2009 six-month review hearing, the agency reported that mother was "in minimal compliance with her case plan." The agency noted that mother tested positive for cocaine in July 2009 and was only minimally engaged in obtaining counseling for substance abuse and domestic violence issues. Mother, who is severely hearing impaired, noted some difficulties in arranging services. Mother was "inconsistent" in her supervised visitations with the children and "forgot" several visits in September 2009. The children displayed "behavioral difficulties following visits" with their mother.

A review hearing in January 2010 found mother in "partial compliance with her case plan." Mother attended domestic violence counseling sessions and parenting classes but missed drug tests, substance abuse counseling and treatment. Mother was permitted unsupervised weekly visits with the girls.

Mother's class attendance improved by April 2010, but she tested positive for marijuana and was not "consistent" in her "pick-up and drop-off times" for child visitation. A psychological assessment of mother found her to have "a history of victimization of abuse both in her family of origin and with her most recent partner," "a strong history of substance abuse," "somewhat limited insight . . . regarding the impact of her behaviors on her children" and "fewer resources than most people for managing the everyday stressors of life."

In October 2010, the agency recommended termination of family reunification services. Mother had tested positive for marijuana multiple times from April to October 2010 and on other days during that same period failed to report for testing. Mother's home was unsafe: she was being harassed by a relative of her former live-in boyfriend, and a friend of hers who tried to protect her from home break-ins was stabbed. Mother

acknowledged to a social worker that "the lack of safety in her living circumstances made reunification unattainable at this time." Mother agreed not to bring the girls to her home during visits yet did so anyway, just days after the stabbing. To ensure the safety of the children, the agency reestablished supervised visitations. The agency reported that mother had not made "sufficient use of services offered in connection with her failure to protect" her children and noted that mother continued to deny the sexual and physical abuse they suffered. The court terminated reunification services and set a hearing to determine a permanent plan for the children.

The agency initially recommended legal guardianship for the children and, in February 2011, the court appointed the girls' foster mother as their legal guardian. The foster mother had cared for the girls since their removal from the family home in May 2009, almost two years earlier. The agency reported that the children "have an amazingly close bond and relationship" with the foster mother and that she, in turn, "has achieved a warm and secure attachment with the children who refer to her as 'mom' and openly show their affection for her." The agency recommended guardianship for the girls "in order to maintain their relationship with their eldest sibling" who had previously been placed in a guardianship in another home. The agency recommended continued visitation with mother but noted that mother's visits were inconsistent. The agency also reported that the children "neither avoid nor look forward to contact with their mother" and that mother "will need to invest more of herself in relation to her daughters for them to internalize her as a parent."

At a review hearing in April 2011, the court received a letter from the children's pediatrician reporting that the children suffer from post-traumatic stress disorder and anxiety and display "heightened anxiety" when they return from visiting mother. The physician stated: "They are hyperactive, agitated, and anxious. They both appear to have their anxiety triggered by visits with their biological mother." Therapists for the girls, then ages 5 and 8, warned that "continued exposure to situations in which [they] feel afraid and worried may impact [their] ability to sustain emotional development, modulate anxiety and learn self calming behaviors from adults." The court continued visitation

with mother but allowed the legal guardian, after consulting with treatment providers, to set visitation conditions consistent with the children's well-being.

In July 2011, the social worker who supervised the visitations reported that "mother is limited in her capacity to be present for the girls and often times is more concerned with the [children's] attention to her needs than tracking their communication and play." The guardian reported that "the girls express agitation, anxiety, and mixed feelings prior to and following the visits." The therapists corroborated the guardian's observations and said the older girl "suffers recurrent nightmares, difficulties with sleep, irritability, and an exaggerated startle response." The children named "the most important people in their life" in the following order: guardian, sisters, brother and mother. The court ordered the children assessed for adoption and set a hearing for a new permanent plan.

The hearing was initially set for November 2011 but was continued several times after mother revealed that one of the girls had a different father than previously represented. The hearing was eventually convened in March 2012 and completed in August 2012.

The agency recommended termination of parental rights and adoption. The evidence submitted at the hearing included a social worker's observation of the parent-child interaction during visitation: "The children do have a relationship with their birth mother, however, from their perspective, it does not arise to a parental relationship. They care about her, worry about her, and are generally willing to engage in the visitation process, if somewhat slowly. They enjoy the activities they do with her, and like most children, like to be the object of her affection. [Mother] obviously cares for her children and feels she can be a good mom to them. However, her understanding of [the girls] as individuals with their own needs, outside of their mother's needs, appears less than well-developed. She does not initiate greeting and welcoming the girls into their visitations space/time. She does not seem able to share her time with both children at once, often favoring one over the other somewhat markedly. At the same time, [mother] does not seem aware of the impact of her behavior on the children, or how it might feel to them."

4

The children's therapists recommended adoption. At the time of the therapists' assessments in April 2012, the girls were ages seven and nine and had lived with their guardian and prospective adoptive mother for three years. The therapist for the younger girl reported that visitations with mother "seem to trigger [the child's] difficult and stressful memories of her past." The therapist observed the girl to have "a positive relationship" with her guardian and to grow anxious at the thought of separating from her. The older girl's therapist reported that the girl has "a secure attachment" to the guardian and, when drawing family scenes, depicts her guardian as the mother; "her biological mother is never represented."

The agency reported that the children "have a friendly relationship with their mother, but it does not rise to the level of a primary parental figure." "They do not turn to [mother] as a primary parent. Having contact with her continues to bring up such trauma that visitation has had to decrease over time." Adoption was discussed with the children and it was found that they "have an age appropriate understanding of adoption and want very much to be adopted." "It is essential for [the children] to feel that they are safe from having to return to their mother, and they want very much to be adopted by their caregiver." Counsel for the children supported the agency's recommendation of adoption.

The court found the children adoptable and rejected mother's reliance on the beneficial parent-child relationship as an exception to adoption. The court stated that mother's visitation has been "inconsistent and sporadic" and, "even if there were regular visitation," mother failed to establish the children would benefit from continuing the relationship. The court questioned whether a parental relationship exists, describing the visits as "little more than play dates with a loving adult." The court noted that the visits did not appear to have "a positive impact on the children. The girls do not ask to visit mother. They do not ask about her between visits. They don't seem to have a desire to initiate contact with her. When they do have visits with the mother, it takes time for them to warm up to her. And again, they have no problem separating from her. Frequently, both before and after a visit, the girls' behavior changes" for the worse. The court

terminated parental rights and ordered the children placed for adoption. Mother filed a timely notice of appeal.

## Discussion

Mother contends the evidence is insufficient to support the court's finding that the beneficial parent-child relationship exception to adoption does not apply. (§ 366.26, subd. (c)(1)(B)(i).)

" 'Adoption, where possible, is the permanent plan preferred by the Legislature.' [Citation.] If the court finds a minor cannot be returned to his or her parent and is likely to be adopted if parental rights are terminated, it must select adoption as the permanent plan unless it finds termination of parental rights would be detrimental to the minor under one of five specified exceptions." (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 947.) Section 366.26, subdivision (c)(1)(B)(i) provides an exception to the termination of parental rights if termination would be detrimental to the child because "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." The requirement that the child "benefit from continuing the relationship" has been interpreted to refer to a "parent-child" relationship that "promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents. In other words, the court balances the strength and quality of the natural parent[-]child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent[-]child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575.)

"While it is the child welfare agency's burden to prove a likelihood of adoption [citation], the burden is on the parent or parents to establish the existence of one of the circumstances that are exceptions to termination." (*In re Thomas R.* (2006) 145 Cal.App.4th 726, 731.) "To meet the burden of proof for the section 366.26, subdivision (c)(1)[(B)(i)] exception, the parent must show more than frequent and loving contact or

6

pleasant visits. [Citation.] 'Interaction between natural parent and child will always confer some incidental benefit to the child . . . . The relationship arises from day-to-day interaction, companionship and shared experiences. [Citation.]' [Citation.] The parent must show he or she occupies a parental role in the child's life, resulting in a significant, positive, emotional attachment from child to parent." (*In re L. Y. L.*, *supra*, 101 Cal.App.4th at pp. 953-954.)

Substantial evidence supports the court's finding that mother does not have a strong parent-child relationship that "promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents." (*In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.) As set out in greater detail above, numerous reports from child welfare workers describe the relationship as loving but not parental. A September 2010 report noted that mother denies the children's trauma from exposure to physical and sexual abuse in the home and lacks "appropriate empathy for how her parenting has negatively impacted" her children. It was also noted that the children "neither avoid nor look forward to contact with their mother" and observed that mother "will need to invest more of herself in relation to her daughters for them to internalize her as a parent." In July 2011, after years of reunification efforts, the children still lacked a strong attachment to mother. When the children listed "the most important people in their life," the children ranked their guardian, sisters, and brother ahead of mother. In December 2011, the agency reported that mother's relationship with the children "does not arise to a parental relationship."

The evidence also supports the trial court's finding that mother's relationship with her children does not promote their well-being. The children's pediatrician and therapists reported "heightened anxiety" from contact with mother. The therapists warned that "continued exposure to situations in which [they] feel afraid and worried may impact [their] ability to sustain emotional development, modulate anxiety and learn self calming behaviors from adults."

Mother argues that permanent legal guardianship for the girls would have provided the stability they need without necessitating the termination of her parental

rights. But adoption provides a level of security unmatched by guardianship and is "the permanent plan preferred by the Legislature " in a situation like this, where the children are adoptable and cannot be returned to their parent. (*In re Autumn H., supra,* 27 Cal.App.4th at p. 573.) "The children are entitled to stability and permanence through adoption. 'Where a biological parent . . . is incapable of functioning in that role, the child should be given every opportunity to bond with an individual who will assume the role of a parent.' " (*In re C.F.* (2011) 193 Cal.App.4th 549, 557.)

### Disposition

The order terminating parental rights is affirmed.


_____
Pollak, J.


We concur:


_____
McGuiness, P. J.


_____
Siggins, J.