Filed 7/27/21

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

<table>
<tr><td>In re B.D., et al., Persons Coming Under the Juvenile Court Law.<br><br>SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>C.D. et al.,<br><br>    Defendants and Appellants.</td><td>D078014<br><br>(Super. Ct. No. EJ4324A, B)</td></tr>
</table>

APPEALS from orders of the Superior Court of San Diego County, Marian F. Gaston, Judge. Reversed and remanded.

Jill Suzanne Smith, under appointment by the Court of Appeal, for Defendant and Appellant, C.D.

Roni Keller, under appointment by the Court of Appeal, for Defendant and Appellant, R.Q.

Office of County Counsel, Caitlin E. Rae, Chief Deputy County Counsel, and Patrice Plattner-Grainger, Deputy County Counsel, for Plaintiff and Respondent.

C.D. (Father) and R.Q. (Mother) appeal from the juvenile court's orders terminating parental rights to their son, B.D. (born 2012) and daughter L.D. (born 2015, together the children). (Welf. & Inst. Code, § 366.26.)[1] The parents contend the juvenile court erred in finding that the beneficial parental relationship exception to adoption did not apply because the evidence demonstrated that terminating parental rights would be detrimental to the children's well-being. They assert that a legal guardianship was the only appropriate permanent plan for the children. (§ 366.26, subd. (c)(1)(B)(i).)

On May 6, 2021, we filed an opinion affirming the orders. Before this opinion became final, Mother filed a petition for rehearing arguing that the recent Supreme Court decision in *In re Caden C.* (2021) 11 Cal.5th 614 (*Caden C.*) indicates that the juvenile court erred in terminating parental rights. We granted rehearing and gave all parties the opportunity to file supplemental briefing on the petition for rehearing and the impact of *Caden C.* on this appeal. We vacate our initial opinion. Having considered the supplemental briefs filed by the parties we reverse the orders terminating parental rights.

When concluding that the parents did not meet their burden of showing that they had a substantial, positive, emotional attachment with their children, the juvenile court and social worker considered the parents' substance abuse without addressing whether this continued substance abuse had any negative effect on the parent-child relationship. We are also uncertain whether the juvenile court considered other factors proscribed by the Supreme Court in determining the beneficial nature of the parent-child

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

relationship.  We therefore must reverse the orders terminating parental rights and remand for the juvenile court to reexamine the record based on a proper application of the governing law.

FACTUAL AND PROCEDURAL BACKGROUND

The San Diego County Health and Human Services Agency (Agency) became involved with this family in August 2018 after sheriff's deputies responded to a domestic violence incident where Mother pepper sprayed Father and then Father chased Mother down the street.  The following month, the Agency received another report that Mother barricaded herself in a bathroom during an argument and that Father broke the door down.  B.D. observed the parents hitting and yelling at each other and stated that Mother was "very hurt" and that he and his sister were scared.  The children also observed a 2017 incident where Mother sustained bruising around her neck, scratches, and lost her voice for two weeks after Father strangled her.

When the Agency investigated, the parents appeared to be on some type of stimulant.  The Agency found marijuana and drug paraphernalia in the parents' bedroom and within the children's reach.  The Agency also found two bags of empty cans or bottles of alcohol in the bedroom.  The parents reported methamphetamine use and Father expressed concern that Mother had an alcohol problem.

In August and September 2018, the Agency requested that Mother drug test seven times, but she only tested twice.  She tested positive for methamphetamine, alcohol, and tetrahydrocannabinol (THC) for the first test, and positive for alcohol and THC for the second test.  The Agency requested six drug tests for Father over a three month period.  He tested twice with both tests positive for THC.

In late October 2018, the Agency filed petitions on behalf of the children under section 300, subdivision (b)(1) alleging that a substantial risk existed that the children would suffer serious physical harm or illness based on the parents' physically violent relationship and use of dangerous drugs.[2] The protective custody warrant affidavits indicated that the children "have expressed feeling scared and crying while witnessing the domestic altercations which is putting them at a high risk of suffering emotionally with depression or anxiety in their future. The children have been observed to show that they are being neglected with their lack of cleanliness, rotting teeth, unchanged diaper at the age of 3.5, and expressing hunger."

At the detention hearing, the juvenile court made a prima facie finding on both petitions. The juvenile court detained the children and ordered supervised visitation for the parents. At the contested adjudication and disposition hearing in January 2019, the juvenile court sustained the petitions, declared the children dependents, placed them with the paternal grandmother D.B. (the caretaker), and ordered reunification services.

The social worker submitted drug test referrals for Mother in February, March, April and May 2019, but she failed to show to every appointment. During a July 26, 2019 office visit, Mother claimed "her clean date was 'sometime in [2018].'" Mother expressed confidence that she would test "clean" that day but did not respond when asked why she had not drug tested

---

[2]     Mother has been involved with the Agency since 2004 regarding allegations of domestic violence, neglect, and alcohol abuse. She has three older children who are not parties to this appeal with another man. The father of these children stated that he has full custody and that Mother "hardly [saw]" these children. Mother received voluntary services in 2004 and again in 2010, but she failed to engage in the recommended services.

in the last six months. Although Mother appeared for an intake appointment for substance abuse treatment, she never returned to the program.

Father admitted that he started using marijuana at age 13, currently used marijuana once or twice a day, and "occasionally" drank alcohol. He denied current methamphetamine use but admitted "having a problem" with the drug in the past. Mother stated, however, that Father used methamphetamine and took "baking soda to pass his tests." The social worker submitted drug test referrals for Father in February, March, April and May 2019, but he failed to show to every appointment. When the social worker informed Father that he only needed to drug test twice to satisfy his case plan objective, Father denied receiving the social worker's calls and text messages regarding testing.

On August 20, 2019, the social worker left Father a voice message advising him that he needed to submit to a random drug test, but Father did not appear for this drug test, which the Agency considered to be a positive test. Two days later, the social worker advised the parents that they needed to drug test that day, which they agreed to do. However, one hour later, the social worker received a voicemail from Mother stating that she and Father would not drug test because it conflicted with their services.

On August 28, 2019, the juvenile court terminated reunification services and set a section 366.26 hearing, which it later rescheduled three times. At the contested section 366.26 hearing in September 2020, the juvenile court found that the parents consistently visited the children but determined that they did not fulfill a parental role. The court terminated the parents' parental rights, selected adoption as the children's permanent plan, and designated their current caregiver as the prospective adoptive parent. The parents timely appealed.

5

## DISCUSSION

### A. *General Legal Principles*

"At a permanency plan hearing, the court may order one of three alternatives: adoption, guardianship or long-term foster care. [Citation.] If the dependent child is adoptable, there is a strong preference for adoption over the alternative permanency plans." (*In re S.B.* (2008) 164 Cal.App.4th 289, 296-297 (*S.B.*).) "Once the court determines the child is likely to be adopted, the burden shifts to the parent to show that termination of parental rights would be detrimental to the child under one of the exceptions listed in section 366.26, subdivision (c)(1)." (*S.B., supra,* at p. 297.)

One of the exceptions to the preference for adoption is the beneficial parent-child relationship exception. (§ 366.26, subd. (c)(1)(B)(i).) For this exception to apply, the parent must show by a preponderance of the evidence: (1) regular visitation and contact with the child; (2) the child has a substantial, positive, emotional attachment to the parent; and (3) terminating that attachment would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home. (*Caden C., supra*, 11 Cal.5th at p. 636.) The existence of the parent-child relationship exception is determined by taking into consideration many variables which affect a parent-child bond including, "[t]he age of the child, the portion of the child's life spent in the parent's custody, the 'positive' or 'negative' effect of interaction between parent and child, and the child's particular needs." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 576 (*Autumn H.*).) " 'The relationship that gives rise to this exception to the statutory preference for adoption "characteristically aris[es] from day-to-day interaction, companionship and shared experiences. Day-to-day contact is not necessarily required, although it is typical in a parent-child relationship."

6

' " (*In re G.B.* (2014) 227 Cal.App.4th 1147, 1165 (*G.B.*).)  When the benefits of a stable, adoptive, permanent home outweigh the harm the child would experience from the loss of a continued parent-child relationship, the court should order adoption.  (*Caden C.*, *supra*, 11 Cal.5th at p. 634.)  The statutory reasons for departing from " 'the norm' " of adoption apply only in " 'exceptional circumstances.' "  (*Id.* at p. 631.)

We review the juvenile court's findings as to whether the parent has maintained regular visitation and contact with the child, as well as the existence of a beneficial parental relationship, for substantial evidence. (*Caden C.*, *supra*,  11 Cal.5th at pp. 639-640.)  As a reviewing court we do " 'not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts' " and will uphold the juvenile court's determinations even where substantial evidence to the contrary also exists.  (*Id.* at p. 640.) "[T]he ultimate decision—whether termination of parental rights would be detrimental to the child due to the child's relationship with his parent—is discretionary and properly reviewed for abuse of discretion."  (*Ibid.*)  "Because terminating parental rights eliminates any legal basis for the parent or child to maintain the relationship, courts must assume that terminating parental rights terminates the relationship.  [Citations.]  What courts need to determine, therefore, is how the child would be affected by losing the parental relationship — in effect, what life would be like for the child in an adoptive home without the parent in the child's life."  (*Id.* at p. 633.)  If severing the natural parent-child relationship exception would deprive a "child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated."  (*Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.)

7

"[W]hen the court holds a section 366.26 hearing, it all but presupposes that the parent has not been successful in maintaining the reunification plan meant to address the problems leading to dependency." (*Caden C.*, *supra*, 11 Cal.5th at p. 637.) Accordingly, "[p]arents need not show that they are 'actively involved in maintaining their sobriety or complying substantially with their case plan' " and "[a] parent's continued struggles with the issues leading to dependency are not a categorical bar to applying the exception." (*Ibid.*) Nonetheless, a parent's struggle with such issues are relevant "to the extent they inform the specific questions before the court: would the child benefit from continuing the relationship and be harmed, on balance, by losing it?" (*Id.* at p. 638.)

The readiness of parents to have a child returned to their custody is not relevant to the application of the parental-benefit exception. (*Caden C.*, *supra*, 11 Cal.5th at p. 638.) Thus, even where parents have not demonstrated a likelihood that they will ever be able to regain custody, the court should not terminate parental rights if doing so "would, when weighed against the offsetting benefits of an adoptive home, be detrimental to the child." (*Ibid.*) In sum, the exception preserves the child's right to the relationship even when the child cannot safely live with that parent. What it does not allow is a judgment about the parent's problems to deprive a child of the chance to continue a substantial, positive relationship with the parent." (*Id.* at p. 643.)

B. *The Juvenile Court's Ruling*

The juvenile court found that the parents "easily met" their burden of showing consistent visitation with the children. After acknowledging the need for a "robust individualized inquiry" the juvenile court stated that "the relationship at issue must be parental, no matter how loving and frequent

the contact, and notwithstanding the existence of an emotional bond with the child.  The parents must show that they occupy a parental role in the child's life.  Such a relationship typically arises from day-to-day interactions, companionship, and shared experiences.  Day-to-day contact is not required; however, for the beneficial relationship exception to apply, the court must find that regular visits and contact have continued or developed as significant positive emotional attachment from child to parent."  The juvenile court determined that the parents "failed to demonstrate the existence of this type of parental relationship with the children."  In making this finding, the juvenile court noted that the paternal grandmother met the children's daily needs and that the children turn to the paternal grandmother to protect and care for them.

The court found the parents' substance abuse, and the impact this had on their ability to safely parent their children, to be their "core issue."  The court stated that despite the parents' progress with online services and their loving visits with the children, that the parents' remained untreated for substance abuse.  The court explained:

> "Until these parents address this major underlying cause of all . . . the instability and disruption and chaos in their lives, substance abuse, they will never be able to safely and reliable parent.  They had two years to address these issues in this case and unfortunately have chosen not to."

Even assuming the parents met their burden of showing a parental relationship, the juvenile court found that they did not meet their burden of proving that severance of that relationship would be detrimental to such a degree that termination of parental rights and a permanent plan of adoption would be detrimental to the children.  The court first noted that the caretaker has consistently said that she supports the parents having a relationship

9

with the children as long as the relationship was "healthy" and that the caretaker has facilitated and encouraged visits between the parents and the children.  Nevertheless, the court considered the possibility that termination of parental rights could sever the children's relationship with their parents, but found this would not be detrimental to the children such that the detriment outweighed the benefits of adoption.

C. *Analysis*

It is undisputed that substantial evidence exists showing that the children were adoptable and that the parents consistently visited the children.  For the second element of the test, the juvenile court is required to examine the record to ascertain whether the parent has proven by a preponderance of the evidence that "the child has a substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship."  (*Caden C.*, *supra*, 11 Cal.5th at p. 636.)

The juvenile court correctly acknowledged that daily contact between parent and child is not required (*G.B.*, *supra*, 227 Cal.App.4th at p. 1165), and that the issue before it was whether the parents met their burden of showing that the visits and contact that occurred between them and the children continued or developed a significant positive emotional attachment between parent and child.  (*Caden C.*, *supra*, 11 Cal.5th at p. 632.)  The juvenile court then found that "the parents have failed to demonstrate the existence of this type of parental relationship with the children."  By this statement, the juvenile court necessarily concluded that the parents did not meet their burden of showing by a preponderance of the evidence that they had a significant positive emotional attachment with the children.  In determining whether the parents met their burden of proof on the second

10

element, the juvenile court did not have the benefit of the guidance provided in *Caden C.*, *supra*, 11 Cal.5th 614 and erred is several respects.

First, the record suggests that in finding the parents did not meet their burden of proof the juvenile court relied heavily, if not exclusively, on the fact that the parents had not completed their reunification plans and were unable to care for the children based on their long term and continued substance abuse. The juvenile court, however, did not examine how the parents' continued substance abuse impacted the nature of the parent-child relationship. (*Caden C.*, *supra*, 11 Cal.5th at p. 638.)

For example, the juvenile court previously found true the allegation that the children's exposure to violent confrontations between the parents placed them at substantial risk of serious physical harm. We located nothing in the record addressing whether these past domestic violence incidents were drug related, or whether the parents continued to struggle with domestic violence. After carefully reviewing the visitation monitor reports we found no suggestion that the parents continued to struggle with domestic violence issues. Rather the record shows that after the trial court terminated the parents' reunification services in August 2019 they both successfully completed domestic violence courses. Accordingly, in addressing the existence of a beneficial parent-child relationship on remand the juvenile court must consider whether the parents' continued struggles with the issues that resulted in this dependency proceeding (1) impacted the amount of visitation, (2) the nature of that contact, or (3) negatively affected the parent-child relationship.

Second, the record does not convince us that the juvenile court examined the nature of the parent-child relationship before the dependency proceeding or the visits and contact between the parents and children during

11

the dependency proceeding, to evaluate whether a significant positive emotional attachment existed between the parents and children. This type of evaluation is crucial to the third step of the analysis, weighing the harm of severing the natural parent/child relationship to the benefits of a new adoptive home.[3] (*Caden C.*, *supra*, 11 Cal.5th at p. 633.)

In their supplemental brief, the Agency contends that the juvenile court properly examined whether a "substantial, positive, emotional attachment" existed between the children and the parents as articulated in *Autumn H.* and *Caden C.* (*Caden C.*, *supra*, 11 Cal.5th at p. 636; *Autumn H.*, *supra*, 27 Cal.App.4th at p, 539.) The Agency argues that we must affirm the juvenile court's substantial evidence determination even if other evidence supports a contrary conclusion. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318.) This argument ignores the juvenile court's reliance on improper factors. Additionally, the Agency's briefing did not summarize the evidence supporting a conclusion that the children *lack* a "substantial, positive, emotional attachment" with their parents. Rather, our review of the record suggests that the parents presented evidence to support a finding that they

---

[3]    In *Caden C.*, *supra*, 11 Cal.5th 614, the record included a bonding study from mother's expert and a report from the Agency's expert revealing that mother and child had a positive relationship. (*Id.* at p. 627.) This evidence ultimately led the juvenile court to conclude that severing the parent-child relationship would greatly harm the child. (*Id.* at p. 628.) Although bonding studies and expert reports are often very informative (*id.* at p. 633, fn. 4), they are not always required because a juvenile court can infer detriment based on the loss of a "significant, positive relationship" with a parent. (See, e.g., *S.B.*, *supra*, 164 Cal.App.4th at p. 301.)

had a beneficial relationship with their children, should the juvenile court credit that evidence.[4]

The juvenile court also expressly considered whether the evidence revealed that the parents occupied a "parental role" in their children's lives and whether a "parental relationship" existed. On this point, the social worker's report stated that the paternal grandmother met the children's daily needs and opined that the parents were "currently not in a position where they are able to take on the parental role and parent their children on a fulltime basis" because the parents lacked secure housing, stable employment and the evidence did not show they have maintained their sobriety. This conclusion factored into the social worker's belief that the parent-child relationship exception did not outweigh the benefits of adoption for the children.

Additionally, at the contested hearing when asked to explain why she believed that the parent-child relationship exception did not apply, the social worker emphasized the parents' inability to attend to the children's day-to-

---

[4] Visitation monitors reported that the children were always happy to see their parents and greeted their parents with hugs. The paternal grandmother reported that the children looked forward to seeing their parents, were happy with their parents and enjoyed spending time with the parents. Visits between the parents and the children invariably ended with hugs and kisses. Although the children returned to their caregiver without any noted concerns, the paternal grandmother informed the social worker that during initial visits the children expressed sadness at the end of visits because they did not understand why their parents could not come home and live with them. The paternal grandmother indicated that with the security of consistent visitation, the children no longer expressed sadness when visits ended because the children knew they would see their parents the following week. The evidence also shows that during supervised visits the parents met the children's physical and emotional needs and parented "on the spot" by directing, praising, or engaging with the children.

day needs and that the children looked to their grandmother to meet their daily needs. Thus, the social worker equated a parental role, as it related to application of the parent-child relationship exception, with the ability to parent "on a fulltime basis" and with a parent maintaining sobriety. The juvenile court ultimately concluded that the parents failed to show the existence of a parental relationship, emphasizing that the paternal grandmother provided for the children's daily needs and the children's statements that the parents failed to care for them.

The juvenile court's references to the paternal grandmother providing for the children's daily needs, whether the parents occupied a "parental role" or whether a "parental relationship" existed are concerning because it is unclear what weight the juvenile court placed on these conclusions when balancing the harm of severing the natural parent-child relationship to the benefits of a new adoptive home in the crucial third step of the analysis. (*Caden C.*, *supra*, 11 Cal.5th at p. 633.)

As *Caden C.*, *supra*, 11 Cal.5th 614 emphasized, when examining whether the parent-child relationship exception applies it is critical for the juvenile court at the second step of the analysis to consider the evidence showing whether the parent's actions or inactions "continued or developed a significant, positive, emotional attachment from child to parent." (*Autumn H.*, *supra*, 27 Cal.App.4th at p. 575; *In re B.D.* (2008) 159 Cal.App.4th 1218, 1234 ["the parent must prove he or she occupies a parental role in the child's life resulting in a significant, positive emotional attachment of the child to the parent"]; *In re C.F.* (2011) 193 Cal.App.4th 549, 555 [same].) A "significant attachment from child to parent results from the adult's attention to the child's needs for physical care, nourishment, comfort, affection and stimulation." (*Autumn H., supra*, at p. 575.) A positive

14

attachment between parent and child is necessarily one that is not detrimental to the child but is nurturing and provides the child with a sense of security and stability. Finally, an emotional attachment is one where the child views the parent as more than a mere friend or playmate and who's interactions with the parent were not ambivalent, detached, or indifferent.[5]

In summary, the juvenile court considered improper factors at the second step of the analysis addressing whether the parents had proven by a preponderance of the evidence that they had "a substantial, positive, emotional attachment" with the children. (*Caden C.*, *supra*, 11 Cal.5th at p. 636.) Accordingly, we need not address whether the juvenile court abused its discretion in weighing the harm of severing the natural parent-child relationship to the benefits of a new adoptive home. (*Ibid.* at p. 633.) Nor do we address the parents' contention that the juvenile court erred in selecting adoption rather than legal guardianship as the permanent plan. Finally, we express no opinion on whether the parent-child relationship exception applies.

## DISPOSITION

The orders terminating parental rights are reversed. The matter is remanded for the juvenile court to conduct a new section 366.26 hearing in conformity with the principles articulated in *In re Caden C.* (2021) 11 Cal.5th 614, the views expressed in this opinion, and taking into consideration the

---

5    To assist the trial court at this second stage of the analysis social worker assessments and evaluations should address whether or not the children have a substantial, positive, emotional attachment to the parents taking into consideration the child's age, the portion of the child's life spent in parental custody, the positive or negative impact of interaction with the parent, and the child's particular needs as required by *Caden C.* (*Caden C.*, *supra*, 11 Cal.5th at pp. 632, 636.)

family's current circumstances and any developments in the dependency proceedings that may have arisen during the pendency of the appeal.

BENKE, Acting P. J.

WE CONCUR:

HALLER, J.

AARON, J.