Filed 11/2/21  In re Y.R. CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(a). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115(a).

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA
## SECOND APPELLATE DISTRICT
## DIVISION THREE

| | |
|---|---|
| In re Y.R. et al., Persons Coming Under the Juvenile Court Law. | B309783 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> Jennifer R. et al., <br><br> Defendants and Appellants. | Los Angeles County Super. Ct. No. DK15810A–B |

APPEALS from orders of the Superior Court of Los Angeles County, Michael E. Whitaker, Judge. Affirmed.

Suzanne Davidson, under appointment by the Court of Appeal, for Defendant and Appellant Jennifer R.

Gina Zaragosa, under appointment by the Court of Appeal, for Defendant and Appellant Jose S.

Rodrigo A. Castro-Silva, County Counsel, Kim Nemoy, Assistant County Counsel, and Peter Ferrera, Deputy County Counsel, for Plaintiff and Respondent.

**INTRODUCTION**

Jennifer R. (mother) and Jose S. (Jose) appeal from the juvenile court's orders terminating mother's parental rights as to Y.R. (born in 2011) and L.S. (born in 2014), and Jose's parental rights as to L.S.[1] The parents contend the court erred when it found the beneficial parent-child relationship exception to adoption did not apply. We affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

The children were detained from mother's and Jose's custody in February 2016, after the Department of Children and Family Services (Department) received a referral alleging that mother allowed Y.R. to attend school while smelling of urine and that Jose was verbally and physically abusive. A person who lived with the family reported that mother often failed to feed Y.R. and give the child her medication. Y.R. would stay in her bedroom and rarely talk to anyone, and she appeared to be afraid of mother and Jose.

In April 2016, the court took jurisdiction over Y.R. and L.S., ordered them to remain placed out of mother's and Jose's custody, and awarded the parents reunification services, including monitored visits with the children. The court prohibited mother and Jose from visiting the children together.

During the first six months of the review period, mother and Jose made progress with their case plans and regularly visited the children. The visits went well, and mother and Jose

---

[1] Jose S. is L.S.'s presumed father. Sometimes he is referred to as Luis S. in the Department's reports. Y.R. has a different father who is not a party to this appeal.

were "attentive and nurturing to the children" and would play with them. In November 2016, the court allowed mother and Jose to have unmonitored visitation with the children and continued the parents' reunification services.

As for the children, they were adjusting well in their foster home. They were "happy, playful and comfortable" around their foster parents, and the children often called them "grandma and grandpa."

As of the 12-month review hearing, mother's and Jose's visits with the children continued to go well, and the parents were complying with their case plans. Mother was depressed and completely dependent on Jose, however. Jose refused to accept any responsibility for his role in the children becoming dependents of the court, blaming the proceedings on mother. The court continued mother's and Jose's reunification services to the 18-month review hearing.

Meanwhile, the children had developed a "healthy bond" with their foster parents, and Y.R.'s behavior and ability to communicate had greatly improved since she was removed from mother's and Jose's custody. When she first came to the Department's attention, Y.R. was struggling to communicate and grasp the "most basic emotions." In her foster parents' care, however, Y.R. was "able to speak and articulate her needs and wants versus pointing at things." L.S.'s behavior had also improved "greatly," and he was learning to "speak and say many words."

As of the fall of 2017, mother and Jose continued to visit the children on a consistent basis. Although the visits went well, mother often asked the children's foster mother to stay with her and the children during visits. The foster mother "had to

eventually allow mother to be alone with the children because [the] foster mother noticed the children would continuously ask [the foster mother] to do things for them instead of mother."

In October 2017, at the 18-month review hearing, the court terminated mother's and Jose's reunification services. While the parents had technically complied with their case plans, the court found they hadn't learned from their programs or made any significant progress addressing the issues that led to Y.R.'s and L.S.'s dependency. For instance, mother and Jose were still engaging in domestic violence, and mother was still dependent on him. A few months later, the court restricted mother and Jose to monitored visitation because they were visiting the children together, in violation of the court's orders. The parents' visits with the children otherwise continued to go well.

In February 2018, the children's foster parents informed the Department that they couldn't adopt the children but were willing to provide them a home for as long as necessary to find suitable adoptive parents. The children were eventually placed with Y.R.'s teacher, Ms. G.,[2] who had expressed interest in adopting them.

In August 2019, mother filed a petition under Welfare and Institutions Code[3] section 388, asking the court to reinstate her reunification services because she had completed a domestic

---

[2] For the sake of consistency and clarity, we continue to refer to the children's original caretakers as the "foster" parents, while referring to their prospective adoptive parent—i.e., Ms. G.—by her last initial.

[3] All undesignated statutory references are to the Welfare and Institutions Code.

4

violence program and was participating in couples' therapy with Jose. The Department interviewed Y.R., mother, Jose, and the children's foster mother in response to mother's petition.

Y.R. told the social worker that mother usually took her and L.S. to McDonalds or to "stores" during their visits. Mother didn't draw or color with Y.R., even though it was one of the child's favorite activities. Y.R. and mother didn't talk much because mother usually talked to the foster mother. The social worker asked Y.R. if she'd like to live with mother again, to which Y.R. responded, "No, I like it here, I want to live with [the foster mother]."

Mother enjoyed visiting the children. She liked taking them to the park and pushing them on swings. But mother didn't know what the children's favorite animals were or what types of food they enjoyed. She told the social worker that she rarely called the children because she didn't want them to get "bored."

According to the foster mother, the children didn't appear to be bonded to mother. During visits, the foster mother had to be firm with mother, telling her not to let the children play with her phone because it took away from their "bonding" time. When mother visited the children at McDonalds, she would eat with them, but then allow them to go off by themselves to the restaurant's play area. Mother didn't speak much to the children, and the foster mother often had to prompt mother and the children to talk to each other.

According to the foster parents, mother would sometimes go weeks without calling the children, even though she was allowed to call them every day. When she did call, it usually was when Y.R. was at school, so she would only speak to L.S. The children never asked to call mother when she didn't call them,

and, according to the foster mother, they "appear[ed] to be okay if they visit[ed] or [did] not visit" with mother.

In October 2019, the court denied mother's section 388 petition. The court found mother failed to show there was a change in circumstances that would support reinstating her reunification services or that doing so would be in the children's best interest. Mother presented no evidence that she had completed, let alone participated in, conjoint counseling with Y.R. and L.S. or that she had taken any meaningful steps to address her volatile relationship with Jose.

In April 2020, the Department reported that the children were adjusting to their placement with Ms. G. Y.R. had already developed a healthy bond with her new caretaker, while L.S. was "slowly" getting used to the new placement. Both children were happy, playful, comfortable, and well-cared for in Ms. G.'s home.

Mother continued to visit with the children. She would pay more attention to L.S. and help him with his homework, but she "struggle[d] to engage" with Y.R. Mother didn't "talk much to the children," and she required "constant prompting to engage" with them. Mother often watched the children "play independently instead of spending her time interacting with them."

According to Ms. G., the visits with mother were "emotionally confusing" for Y.R. and L.S. because the visits weren't allowing them to "move forward" with the adoption process. L.S. would sometimes act out or become closed off after returning from visits with mother, which Ms. G. attributed to "some frustration or ambivalence" caused by visiting the parents.

In early January 2021, the Department reported that the children had adjusted well to Ms. G.'s home. Ms. G. was meeting all of their developmental needs, and she was "protective, loving,

and patient" with them. The children told the Department that they felt safe in Ms. G.'s home, and they asked when she could adopt them because they were "looking forward to it."

The court held the selection and implementation hearing on January 5, 2021. Mother and Jose testified.

Mother visited the children for an hour to an hour and a half every Tuesday and Thursday and on alternating Sundays. The visits had been remote since early 2020 because of the COVID pandemic. The children often read and sang to mother, and they would do math and spelling flash cards together. When asked about her bond with the children, mother stated that she "tell[s] them that [she] love[s] them so much," that she wants them to behave where they are, and that they need to do well in school. The children usually were happy to see her, and sometimes L.S. didn't want the visits to end.

Mother would ask the children how they were doing in school, but they wouldn't always tell her. They also didn't keep her informed about what was going on in Ms. G.'s home. Mother never called to check in on the children because she didn't like to talk to Ms. G. or "answer questions about [the] kids."

Jose visited L.S. for an hour once every two weeks. They used to visit in person but the visits had been remote since early 2020. Jose and L.S. generally had a "good time" when they talked, and they often read and sang to each other. The child was usually engaged during visits, and he would share details about his life with father. Jose gave his son "advice" and talked to him about "all the things" a parent has to say to his child.

The court found mother and Jose failed to establish that the parent-child relationship exception to adoption applied, explaining that it gave "more weight and credibility to the

Department's evidence." Although the parents met the first prong of the exception—regular contact and visitation with the children—they failed to show they occupied a "parental role" in the children's lives. The court also noted that the parents failed to complete any of the objectives of their case plans or to take "meaningful significant roles in providing for the health, education, and welfare" of the children. The court found the children were adoptable, terminated mother's and Jose's parental rights, and ordered adoption as the permanent plan.

Mother and Jose appeal.

## DISCUSSION

Once reunification services in a dependency case have been terminated, " 'the focus [of the proceedings] shifts to the needs of the child for permanency and stability.' " (*In re Celine R.* (2003) 31 Cal.4th 45, 52.) Adoption then becomes the preferred permanent plan for the child, and it should be ordered "unless exceptional circumstances exist." (*In re Casey D.* (1999) 70 Cal.App.4th 38, 51.)

Under section 366.26, the juvenile court must terminate parental rights if it finds by clear and convincing evidence that the child is likely to be adopted. A parent may avoid termination of parental rights, however, if she can show certain circumstances exist that support an exception to adoption. (*In re Caden C.* (2021) 11 Cal.5th 614, 617 (*Caden C.*).) One exception exists where there is a beneficial relationship between the parent and her child. (*Ibid.*) To establish the beneficial parent-child relationship exception, the parent must show, by a preponderance of the evidence, that: (1) she has "maintained regular visitation and contact with the child and the child would benefit from continuing the relationship" and (2) the court finds

that the relationship provides a "compelling reason for determining that termination [of parental rights] would be detrimental to the child." (§ 366.26, subd. (c)(1)(B)(i).)

In *Caden C.*, our Supreme Court clarified how this exception should be applied. "The language of [the beneficial parent-child relationship] exception, along with its history and place in the larger dependency scheme, show that the exception applies in situations where a child cannot be in a parent's custody but where severing the child's relationship with the parent, even when balanced against the benefits of a new adoptive home, would be harmful for the child." (*Caden C.*, *supra*, 11 Cal.5th at p. 630.)

When evaluating whether the beneficial parent-child relationship exception applies, "the court acts in the child's best interest in a specific way: it decides whether the harm of severing the relationship outweighs 'the security and the sense of belonging a new family would confer.' [Citation.] 'If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that,' even considering the benefits of a new adoptive home, termination would 'harm[ ]' the child, the court should not terminate parental rights. [Citation.] That subtle, case-specific inquiry is what the statute asks courts to perform: does the benefit of placement in a new, adoptive home outweigh 'the harm [the child] would experience from the loss of [a] significant, positive, emotional relationship with [the parent?]' [Citation.] When the relationship with a parent is so important to the child that the security and stability of a new home wouldn't outweigh its loss, termination would be 'detrimental to the child *due to*' the child's beneficial

relationship with a parent." (*Caden C.*, *supra*, 11 Cal.5th at pp. 633–634.)

The Supreme Court rejected a rationale applied by some appellate courts—i.e., that a parent's failure to make adequate progress with her case plan or to address the issues that led to the children's dependency, standing alone, can defeat an inference that the beneficial parent-child relationship exception applies. (*Caden C.*, *supra*, 11 Cal.5th at pp. 637–638.) The Supreme Court explained that because the exception applies only in situations where reunification services have been terminated and, therefore, the parent will presumably never reunite with her child, the parent's failure to progress in reunification services or to adequately address the issues that led to her child's dependency, while sometimes relevant to evaluating the strength and benefits of the parent-child relationship, cannot, in isolation, determine whether the exception should apply. (*Ibid.*) All that matters is whether the child's relationship with her parent is so significant that it outweighs the benefits of adoption. (*Id.* at pp. 635–636.)

Thus, to establish the beneficial parent-child relationship exception applies, the parent "must show regular visitation and contact with the child, taking into account the extent of visitation permitted. Moreover, the parent must show that the child has a substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship. And the parent must show that terminating that attachment would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home. When the parent has met that burden, the parental-benefit exception applies such that it would not be in

the best interest of the child to terminate parental rights, and the court should select a permanent plan other than adoption." (*Caden C.*, *supra*, 11 Cal.5th at pp. 636–637.) In evaluating whether the exception applies, courts should look to several factors, including the age of the child, the amount of time she spent in her parent's custody, the quality of interaction between parent and child, and the child's particular needs. (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 576.)

We review the court's findings concerning the frequency of contact and the existence of a beneficial parent-child relationship for substantial evidence, and we review for abuse of discretion the court's decision whether the detriment that a child would suffer from terminating parental rights outweighs the benefits the child would receive from the permanency and stability of adoption. (*Caden C.*, *supra*, 11 Cal.5th at pp. 639–640.)

As a preliminary matter, we note that mother and Jose don't challenge the court's finding that the children are adoptable. The parents also don't address whether substantial evidence supports any of the court's findings as they relate to Jose's relationship with L.S. Mother's briefs address only the merits of the court's findings as they relate to her relationship with the children, and Jose's opening brief (he didn't file a reply brief) contends only that the court applied the incorrect standard in evaluating whether the beneficial parent-child relationship exception applies. Neither parent addresses whether Jose presented sufficient evidence to satisfy the exception with respect to L.S. We therefore don't address in detail the court's conclusion that Jose did not satisfy the beneficial parent-child relationship exception. Suffice it to say that we have reviewed the entire record and are confident that the court properly found L.S. did

11

not have a sufficient emotional attachment to Jose such that terminating their relationship would outweigh the benefits L.S. would receive from a permanent adoptive home.

Turning to mother's case, the parties don't dispute that she met the first prong of the beneficial parent-child relationship— i.e., maintaining regular contact and visitation with Y.R. and L.S. We therefore must decide whether mother showed that the children had such a "substantial, positive, [and] emotional attachment" to her that the harm they would suffer from terminating her parental rights outweighed the benefits of a permanent and stable adoptive home. (*Caden C.*, *supra*, 11 Cal.5th at pp. 636–637.) Mother did not satisfy that burden here.

By the time of the selection and implementation hearing, Y.R. and L.S. had lived out of mother's custody for nearly five years. That accounts for about half of Y.R.'s life and more than two thirds of L.S.'s life. Nothing in the record indicates the children shared a particularly strong bond with mother before they were removed or that their bond strengthened after removal. For instance, Y.R. rarely spoke before she was taken from mother's and Jose's custody, and she appeared to be afraid of mother and Jose. Due to his young age, L.S. didn't learn to talk until after he was placed in foster care. By all accounts, the children began to thrive early on in their foster parents' care and their behavior greatly improved while they were out of mother's and Jose's custody.

While mother's visits with the children generally went without incident throughout the reunification and permanency planning periods of this case, there is nothing in the record that shows the children developed a strong bond with her through those visits. The foster mother told the Department that mother

12

never bonded with the children and that mother usually was more interested in spending time with the foster mother than the children. The foster mother often had to distance herself from mother or redirect mother's attention just to get mother to pay attention to the children. Unsurprisingly, the children and mother had difficulty connecting with each other. Indeed, mother rarely called the children, telling the Department she didn't want them to "get bored," and she didn't know what types of foods or activities they were interested in.

Mother's detached behavior affected the children, and Y.R. was clearly attuned to it. Y.R. told the Department that she rarely talked to mother while they were visiting because mother spent most of the time with the foster mother. Y.R. also mentioned that mother didn't draw or color with her, even though it was one of the child's favorite activities. The children didn't ask their foster parents why mother didn't call them, and, according to the foster mother, they didn't seem to care whether or not they visited mother. In late 2019, Y.R. told the Department that she didn't want to live with mother because she preferred living with her foster parents. And, shortly before the selection and implementation hearing, the children told the Department that they were "looking forward" to being adopted by Ms. G. and felt safe and comfortable living in her home.

While mother appeared to be more closely bonded to L.S. and would pay more attention to him during visits, the record supports a finding that mother and L.S. didn't share an emotional bond that was so significant that any harm from severing that relationship would outweigh the benefits of a stable and permanent adoptive home. (See *In re C.F.* (2011) 193 Cal.App.4th 549, 555 ["A parent must show more than frequent

and loving contact or pleasant visits."].) In fact, Ms. G. told the Department that the visits with mother were having a negative impact on the children's emotions and behavior, especially L.S., who would sometimes act out or appear frustrated after seeing mother. According to Ms. G., the visits were confusing the children because they weren't allowing them to move forward with the adoption process.

In short, the record supports a finding that the children and mother lacked a "substantial, positive, [and] emotional attachment." Mother, therefore, failed to establish the second prong of the beneficial parent-child relationship exception.

Finally, we turn to Jose's argument that the court applied the incorrect standard in determining whether the beneficial parent-child relationship exception applied in this case. Jose takes issue with the fact that the court focused on the parents' failure to make meaningful progress in their reunification services or to otherwise adequately address the issues that led to the children's dependency proceedings. Jose also contends it is impossible to determine how much weight the juvenile court placed on its finding that he and mother did not occupy a "parental role" in the children's lives when " 'balancing the harm of severing the natural parent-child relationship to the benefits of a new adoptive home.' " Jose contends the court's failure to apply the correct standard requires us to reverse the orders terminating his and mother's parental rights and remand the matter for a new selection and implementation hearing. This argument lacks merit.

To be sure, the court referenced the parents' prior failure to reunify with their children and complete their case plans. Viewed in context, however, the court's statements and findings at the

14

hearing make clear it decided to terminate mother's and Jose's parental rights because they failed to meet their burden of demonstrating that the children have a substantial, positive, emotional attachment to the parents, and that the children would benefit from continuing the relationship.

Even if we were to accept Jose's argument that the court articulated the wrong standard in evaluating whether the beneficial parent-child relationship exception applied, it is well-settled that we review the juvenile court's ruling, not its rationale, and we must affirm that ruling if it's correct on any ground. (*In re B.L.* (2012) 204 Cal.App.4th 1111, 1116.) Here, the record overwhelmingly supports a finding that Y.R. and L.S. did not share a sufficient emotional attachment to mother, and L.S. did not share a sufficient emotional attachment to Jose, such that the harm the children would suffer from terminating mother's and Jose's parental rights would outweigh the benefits the children would receive from a stable and permanent adoptive home. (See *Caden C.*, *supra*, 11 Cal.5th at pp. 636–637.) The court, therefore, didn't abuse its discretion in terminating mother's and Jose's parental rights.

## DISPOSITION

The court's orders terminating mother's and Jose's parental rights and setting adoption as the permanent plan are affirmed.

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

LAVIN, J.

WE CONCUR:

EDMON, P. J.

EGERTON, J.