[No. D058382. Fourth Dist., Div. One. Mar. 16, 2011.]

In re C.F. et al., Persons Coming Under the Juvenile Court Law.
SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY,
Plaintiff and Respondent, v.
SARA D., Defendant and Appellant.

**COUNSEL**

Patricia K. Saucier, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel, and Paula J. Roach, Deputy County Counsel, for Plaintiff and Respondent.

Terence M. Chucas, under appointment by the Court of Appeal, for Minors.

## OPINION

**McCONNELL, P. J.**—Sara D. appeals a juvenile court judgment terminating her parental rights to her sons, C.F. and G.F., and her daughter, N.F., and choosing adoption as the appropriate permanent plan. (Welf. & Inst. Code, § 366.26.)[1] Sara challenges the sufficiency of the evidence to support the court's finding that the parent-child beneficial relationship exception to adoption preference (§ 366.26, subd. (c)(1)(B)(i)) is inapplicable. We affirm the judgment.

### FACTUAL AND PROCEDURAL BACKGROUND[2]

In June 2007 the San Diego County Health and Human Services Agency (the Agency) filed petitions on behalf of the children, which alleged they had been exposed to domestic violence between Sara and her boyfriend. (§ 300, subd. (b).) The children then ranged in age between three and seven years. The oldest boy, C.F., has Down syndrome and special needs.

The Agency had intervened the preceding May. Sara agreed to voluntary services and to have her boyfriend move out of the home. She did not follow through with referrals, however, or keep in contact with the Agency. A maternal aunt reported she had not seen the family for some time, the oldest two children were truant from school, and she understood the family was living "at a known drug house" with Sara's boyfriend. The Agency located the family and took the children into protective custody. They were detained with the aunt. In addition to an ongoing domestic violence issue, Sara admitted she has a lengthy history of crystal methamphetamine use, and that "she would care for the children while being under the influence . . . for two to three days at a time."

The court ultimately allowed Sara 18 months of services, including participation in SARMS (Substance Abuse Recovery Management System), domestic violence and parenting programs, general counseling, and supervised visitation. At the 18-month review hearing in March 2009, the court found she was in compliance with her case plan and returned the children to her care, subject to family maintenance services.

In September 2009, however, the Agency filed supplemental petitions for the children (§ 387), alleging Sara had relapsed "because she felt overwhelmed with the care of the children and financial challenges." In July and

---

[1] Further statutory references are also the Welfare and Institutions Code.

[2] In this section of the opinion, we give only a brief recitation of the facts. To avoid repetition, we address the specific facts pertaining to the parent-child relationship exception to adoption in the following discussion section.

August 2009 she tested positive for amphetamines and methamphetamines. She admitted to drug use. The children were returned to their maternal aunt and Sara voluntarily reentered treatment.

In February 2010 Sara again tested positive for methamphetamine. Further, despite a restraining order in place she had resumed a relationship with her boyfriend, and he had again physically abused her. In March Sara did not appear for a drug test.

In its assessment report for the section 366.26 hearing, the Agency recommended the termination of parental rights and adoption as the preferred permanent plan. During a contested hearing in October 2010, Sara argued for the preservation of her parental rights. The court found by clear and convincing evidence that the children are adoptable and none of the statutory exceptions to adoption is applicable. The court terminated parental rights and found adoption is in the children's best interest.[3]

## DISCUSSION

### I

Once the court determines the child is likely to be adopted, the burden shifts to the parent to show that termination of parental rights would be detrimental to the child under one of the exceptions listed in section 366.26, subdivision (c)(1). (*In re Zachary G.* (1999) 77 Cal.App.4th 799, 809 [92 Cal.Rptr.2d 20].) An exception to the adoption preference applies if termination of parental rights would be detrimental to the child because the "parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).)

The issue is subject to a sufficiency of the evidence standard of review. (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 576 [32 Cal.Rptr.2d 535] (*Autumn H.*).) "On review of the sufficiency of the evidence, we presume in favor of the order, considering the evidence in the light most favorable to the prevailing party, giving the prevailing party the benefit of every reasonable inference and resolving all conflicts in support of the order." (*Ibid.*)

---

[3] The parental rights of the children's presumed father were also terminated, but he is not involved in this appeal.

The parties differ as to whether Sara maintained regular visitation with the children.[4] The appellate record shows as follows. Sara was given weekly supervised visitation, but at the time of the 12-month review her visitation had been inconsistent. New Alternatives Family Visitation Center discontinued supervising visitation because of Sara's noncompliance; she did not appear for visits approximately nine times.

In September 2008 Sara was granted unsupervised visits. She visited the children weekly for four to five hours at a time without incident, and in November 2008 she was awarded full-day unsupervised visits. In March 2009, however, the Agency reported that during some of the visits she did not care for the children on her own, and instead the maternal grandmother joined her. Once, Sara returned the children to the maternal aunt early because they were hungry and she had no money for food.

In September 2009, after Sara's relapse, she was allowed supervised visitation facilitated by the maternal grandmother. Sara, however, seldom visited the children. Between November 2009 and January 2010, she saw them just three times. Sara attributed the lack of visitation to a lack of money. She did have frequent phone contact with the children.

In April 2010 the Agency reported that Sara "continues to visit her children weekly." While visits were scheduled for 1:00 p.m. to 5:30 p.m., Sara usually arrived late. Once, Sara brought a friend with her and stayed only two and a half hours. Another time, Sara, the maternal aunt and the children went to see two movies. The entire group went to the first movie, but because Sara did not want to see the second movie the children selected she went to a different movie and left the aunt with the children. At the beginning of September 2010, Sara began having three 2-hour supervised visits per week. It appears she adhered to that schedule to the time of the section 366.26 hearing the following month.

■ Sara was more consistent with visitation as the section 366.26 hearing neared, but we agree with the Agency's assessment that overall her visitation was sporadic. Sporadic visitation is insufficient to satisfy the first prong of the parent-child relationship exception to adoption. (*In re Elizabeth M.* (1997) 52 Cal.App.4th 318, 324 [60 Cal.Rptr.2d 557].)

---

[4] Appointed counsel for the children has filed a brief in support of the Agency's position on the parent-child beneficial relationship exception to adoption.

## II

## A

In any event, the court's ruling is proper even if Sara's visitation is deemed regular. The evidence amply supports a finding the second prong of the beneficial parent-child relationship exception is unmet.

■ This court has interpreted the phrase "benefit from continuing the relationship" in section 366.26, subdivision (c)(1)(B)(i) to refer to a "parent-child" relationship that "promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents. In other words, the court balances the strength and quality of the natural parent[-]child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent[-]child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*Autumn H., supra*, 27 Cal.App.4th at p. 575.)

A parent must show more than frequent and loving contact or pleasant visits. (*In re Derek W.* (1999) 73 Cal.App.4th 823, 827 [86 Cal.Rptr.2d 739].) "Interaction between natural parent and child will always confer some incidental benefit to the child. . . . The relationship arises from day-to-day interaction, companionship and shared experiences." (*Autumn H., supra*, 27 Cal.App.4th at p. 575.)[5] The parent must show he or she occupies a parental role in the child's life, resulting in a significant, positive, emotional attachment between child and parent. (*Autumn H., supra*, 27 Cal.App.4th at p. 575; *In re Elizabeth M., supra*, 52 Cal.App.4th at p. 324.) Further, to establish the section 366.26, subdivision (c)(1)(B)(i) exception the parent must show the child would suffer detriment if his or her relationship with the parent were terminated. (*Autumn H., supra*, at p. 575.)

Sara cites portions of the Agency's report for the section 366.26 hearing that state the children appeared to enjoy visits with her, they appeared to have an emotional connection with her, and the two younger children, G.F.

---

[5] However, as we clarified in *In re Casey D.* (1999) 70 Cal.App.4th 38, 51 [82 Cal.Rptr.2d 426]: "Day-to-day contact is not necessarily required, although it is typical in a parent-child relationship. A strong and beneficial parent-child relationship might exist such that termination of parental rights would be detrimental to the child, particularly in the case of an older child, despite a lack of day-to-day contact and interaction."

and N.F., said they wanted to continue seeing her.[6] G.F. said he would be "mad" if he was unable to see Sara, but he also said he would feel "good" if he could remain living with his aunt and grandmother. N.F. said she would be "sad" if she could no longer see her mother, but she also said she likes living with her aunt and grandmother because "they take good care of us." The children reported they felt safe at their aunt's home, and they knew they could count on her and their grandmother to meet their needs.

The maternal grandmother, who supervised visits at a park, testified the children were happy and excited to see their mother at the beginning of visits. The children would run to Sara and greet her with hugs, and Sara responded with affection. At times, however, the grandmother had to remind Sara to play with the children or attend to their needs. The grandmother tried to crochet during visits, but she had to intervene because Sara would lose track of the children's whereabouts. When asked whether Sara engaged in activity with the children, the grandmother responded, "Sometimes she will play with them with the frisbee or with the ball, but sometimes she just sits there and talks to me." When the grandmother first began supervising visits, N.F. was sometimes sad at the end of a visit. She no longer acted sad, however, but she did occasionally ask Sara to stay longer. None of the children cried at the end of a visit. The daughter never asked for her mother between visits.

The maternal aunt testified she preferred to adopt the children, rather than be their legal guardian, to give them more stability and structure. The aunt feared that with a guardianship, Sara may later bring legal proceedings to regain custody of the children, and then relapse again. She intended to allow Sara visitation if she maintained sobriety. The children had lived with the aunt during the entire period of the dependency proceedings, with the exception of six months when they were returned to Sara's custody before her relapse. The aunt took care of all their needs, including the special needs of C.F.

The section 366.26 hearing report discusses visits the protective services worker observed. During one visit at the maternal aunt's home, the two boys did not react when Sara appeared, and rather "continued to sit on the couch and watch TV." When the children went to the table to eat a snack the maternal grandmother prepared, Sara sat on the couch. During a later visit at a park, Sara could not get C.F. to descend a slide. Sara phoned the aunt, and after she talked to the boy for a few minutes he went down the slide. Sara told the protective services worker that "she has to call her sister, the caregiver, at times to talk to [her son] during visits, 'Because he only listens good to my sister . . . he is used to her because she has been caring for him.' " At the end

---

[6] The Agency was unable to discuss the concept of adoption with the older son, C.F., because of his special needs.

of the visit, the grandmother told the protective services worker, "this was the first time that the mother plays with the kids when they are at the park." The grandmother said that "usually the mother sits and watches them."

Further, the protective services worker observed that during two out of four visits, Sara had to phone the maternal aunt to redirect C.F.'s behavior. Additionally, Sara was frequently uninvolved with the children during visits, and she would watch TV while they were playing in their rooms. The aunt or grandmother would try to facilitate interaction between Sara and the children by, for instance, bringing out a game. Neither of the boys cried or appeared distressed at the end of visits, and while the girl cried a few times when she separated from her mother, she did not appear distressed at the end of most visits. The report states the children "appear used to the mother coming and going from their lives and transition easily from the visitations with their mother."

Sara cites the protective services worker's testimony that she played a parental role *before* the Agency initially took the children into protective custody. The section 366.26 hearing, however, was held more than three years later. The relevant question was the quality of the parent-child relationship at that time, given that they had been out of her custody for a lengthy period.

■ We conclude the court's ruling is supported by substantial evidence. While Sara and the children had pleasant visits, and her daughter was sometimes sad to see them end, there is no bonding study or other evidence that shows Sara occupied a parental role in their lives, that they would suffer any actual detriment on the termination of parental rights, or that the benefits of continuing the parental relationship outweighed the benefits of permanent placement with family members who are ready to give them a permanent home. While the two older children preferred to keep visiting Sara, it is apparent that all the children look to the maternal aunt and grandmother to fulfill all of their emotional and physical needs, including the special needs of C.F. Indeed, Sara has difficulty redirecting C.F.'s behavior without help from the aunt. The children are entitled to stability and permanence through adoption. ■ "Where a biological parent . . . is incapable of functioning in that role, the child should be given every opportunity to bond with an individual who will assume the role of a parent." (*In re Brittany C.* (1999) 76 Cal.App.4th 847, 854 [90 Cal.Rptr.2d 737].)

B

Sara relies primarily on this court's opinion in *In re S.B.* (2008) 164 Cal.App.4th 289 [79 Cal.Rptr.3d 449] (*S.B.*). In accordance with *Autumn H., supra*, 27 Cal.App.4th 567, in *S.B.* we required that the father, relying on the

exception of section 366.26, subdivision (c)(1)(B)(i), establish the existence of a significant, positive, emotional attachment between him and his daughter. (*S.B.*, at p. 297.) In finding the father met this requirement, we noted he maintained regular, consistent and appropriate visitation with the child; he was the child's primary caretaker for three years; when she was removed from his custody he immediately acknowledged his drug use was untenable, started services, maintained his sobriety, sought medical and psychoanalytic services and complied with every aspect of his case plan; and after a year apart the child continued to display a strong attachment to her father. (*Id.* at p. 298.) We stated: "The record shows S.B. loved her father, wanted their relationship to continue and derived *some measure of benefit* from his visits. Based on this record, the only reasonable inference is that S.B. would be greatly harmed by the loss of her significant, positive relationship with [her father]." (*Id.* at pp. 300–301, italics added.)

The italicized language has proven to be problematic. In *In re Jason J.* (2009) 175 Cal.App.4th 922 [96 Cal.Rptr.3d 625] (*Jason J.*), we dealt directly with an attempt to use the "some measure of benefit" language in *S.B.* to diminish the otherwise heavy burden a parent must meet under *Autumn H.* in establishing the parent-child beneficial relationship exception. We stated: "The *S.B.* opinion must be viewed in light of its particular facts. It does not, of course, stand for the proposition that a termination order is subject to reversal whenever there is 'some measure of benefit' in continued contact between parent and child." (*Jason J., supra*, 175 Cal.App.4th at p. 937.)

Our effort in *Jason J.* to discourage the improper and inaccurate use of our opinion in *S.B.* has not been successful. Following *Jason J.*, in literally dozens of unpublished opinions various panels of this court and courts in other appellate districts have been required to distinguish *S.B.* on its facts and repeatedly reject the notion a parent can prevent termination of parental rights by merely showing there is some measure of benefit in maintaining parental contact. We have not found any case, published or unpublished, in which a reviewing court, relying on *S.B.*, provided relief to a litigant whose parental rights were terminated.

The instant action is a prime example. Sara relies on *S.B.*, claiming her children would derive benefit from a continued relationship with her, even though the facts here are readily distinguishable. Sara did not maintain her sobriety. She resumed drug use and lost custody of her children after the reunification period ended. She made no showing the termination of parental rights would cause the children any detriment. Yet, she asserts the facts here are "extremely similar" to the facts in *S.B.*

In light of these circumstances, we once again emphasize that *S.B.* is confined to its extraordinary facts. It does not support the proposition a parent

may establish the parent-child beneficial relationship exception by merely showing the child derives some measure of benefit from maintaining parental contact. As *Autumn H.* points out, contact between parent and child will always "confer some incidental benefit to the child," but that is insufficient to meet the standard. (*Autumn H., supra,* 27 Cal.App.4th at p. 575.) Moreover, given the unwarranted burden placed on this court and other courts by appellate counsel's reliance on *S.B.* when the facts are not even arguably similar, we observe: "Counsel should not forget that they are officers of the court, and while it is their duty to protect and defend the interests of their clients, the obligation is equally imperative to aid the court in avoiding error and in determining the cause in accordance with justice and the established rules of practice." (*Furlong v. White* (1921) 51 Cal.App. 265, 271 [196 P. 903].)

## DISPOSITION

The judgment is affirmed.

Benke, J., and McDonald, J., concurred.

A petition for a rehearing was denied April 6, 2011, and appellant's petition for review by the Supreme Court was denied June 8, 2011, S192403.