Filed 8/28/13  In re J.D. CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re J.D., a Person Coming Under the Juvenile Court Law. | |
| CONTRA COSTA COUNTY CHILDREN & FAMILY SERVICES BUREAU,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>R.G.,<br><br>        Defendant and Appellant. | A137576<br><br>(Contra Costa County Super. Ct. No. J11-01482) |

R.G. (mother) appeals from a juvenile court order terminating her parental rights and implementing a plan of adoption.  Mother contends the court should have maintained her rights and rejected adoption on the ground she had a beneficial parental relationship with her child, J.D.  Although mother and J.D. enjoyed positive supervised visits during the reunification period, these periodic interactions were not sufficient to establish the kind of relationship that would require a juvenile court to reject adoption.  We therefore affirm the termination and implementation order.

**FACTUAL AND PROCEDURAL BACKGROUND**

In October 2011, the Contra Costa County Children and Family Services Bureau (County) filed a dependency petition removing 10-month-old J.D. from her parents' care.  The petition, as amended, accused father of engaging in domestic violence, placing J.D.

1

at risk, and accused mother of failing to protect J.D. from this violence. It also accused both parents of substance abuse impairing their abilities to care for J.D. The parents pleaded no contest to the amended petition, and the juvenile court sustained it.

The court initially placed J.D. in a foster home, but on January 12, 2012, J.D. moved into the care of a non-related extended family member, whom all parties call "aunt."

Following disposition later in January, the juvenile court authorized J.D.'s continued placement with the aunt and ordered the parents to comply with a six-month reunification plan. Under the plan, mother was required to (1) complete a mental health assessment, (2) complete psychotropic medication evaluation and monitoring, (3) participate weekly in and successfully complete a domestic violence program and comply with the restraining order in place for her protection from father, (4) participate weekly in and successfully complete general counseling, (5) participate weekly in and successfully complete a parenting education program, (6) refrain from substance abuse and successfully complete drug treatment programs, and (7) submit to drug testing and have negative results.

Nine months later, on September 13, 2012, the juvenile court terminated mother's reunification services, reduced visitation to once monthly, and set a hearing to address permanent placement options under Welfare and Institutions Code section 366.26.[1]

The County's July 2012 status review report, which the juvenile court adopted, detailed the domestic violence and substance abuse precipitating state intervention. It also noted mother, despite some limited successes (such as completing 10 of 10 parenting classes), had largely failed to make progress on her case plan and had not changed her problematic behaviors. Mother registered for drug testing, but never actually submitted to a single test. Mother attended just one domestic violence class despite repeated attempts by the facilitator and social worker to have her return. Attendance at individual therapy was irregular. Moreover, mother and father had not complied with the protective

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

2

order, indeed they were living together during part of the plan period. Mother told a social worker she ignored the order because she wants J.D. to have contact with father. In April 2012, mother and father went out to see a movie. While driving, they argued. Father hit mother in the head, causing her to lose control of the car and crash into a fence.

According to the supplementary testimony of a social worker, mother, in July and August 2012, made an effort to restart domestic violence counseling. Mother attended three sessions on July 26, August 9, and August 21. She missed sessions, however, and apparently had not been to a session between August 21 and the September 13 hearing. There is no evidence mother resumed counseling again.

The section 366.26 hearing took place in December 2012. The juvenile court terminated the parents' rights and ordered J.D. placed for adoption, finding no substantial probability J.D. would be returned to her parents within six months and finding by clear and convincing evidence J.D.'s adoption was likely, given the aunt's interest in and suitability for adoption.

At the hearing, mother testified to regular, supervised visits with J.D. At first, they were once weekly, then reduced to twice monthly, then once a month. Mother asserts she missed only one of her allowed visits. Though her in-person visits were reduced, mother said she spoke with J.D. on the phone every other day. Mother stated she and J.D. were "very close." Mother stated "[s]he loves to give me kisses," "she runs to me and calls me 'mama,' " "she says 'I love you, mama,' " and "we play and we read together and we just have a fun time." Although a County report from January 2012, nearly a year earlier, suggested J.D. occasionally protested when her parents left, Mother offered no testimony at the hearing suggesting J.D. was ever sad or anxious at the ends of visits with her, stating only she thought J.D. knew she would see father after mother.

The County's December 2012 section 366.26 report, which the juvenile court again adopted, corroborated mother's testimony about the frequency and the generally "appropriate" nature of her visits with J.D. Mother engaged and supervised J.D. in play in a fun and positive way, taught J.D. new words, and comforted J.D. when she was upset. Further, as related in the July status review report, on one occasion mother

expressed concern about a diaper rash she blamed on the aunt.  According to the County, however, mother began to miss visits after the April 2012 car crash.  The section 366.26 report also suggests it was aunt whom J.D. called "mom."  In fact, one of mother's social workers had previously testified, and the juvenile court had explicitly found,  J.D. reserved the term "mama" or "mommy" for aunt, not mother.  Ultimately, the section 366.26 report concluded mother's regular visits did not establish a connection that would outweigh the benefits of permanent adoption.

At the end of the hearing, mother's attorney asked for guardianship instead of adoption and "argue[d] there is a sufficient bond here" to prevent adoption.  The County argued adoption was the only option unless mother could show an exception, and she could not, given there was "insufficient evidence" termination of rights "would be detrimental to the child because of the relationship the child has with the mother."  No party, nor the juvenile court, explicitly mentioned section 366.26, subdivision (c), and its various exceptions to adoption.

The juvenile court stated it was "very, very familiar with this case" and had "read every report in the file."  It concluded:

> "I absolutely do not feel that this child is safe in the parents' home.  I feel the child would be in danger.  And I think it is essential that we terminate parental rights.  [¶] . . . [¶] [B]y clear and convincing evidence it would be detrimental to return the child to the parents' custody . . . actually . . . beyond a reasonable doubt it would be harmful . . . ."

Mother appealed from the section 366.26 order terminating her parental rights and selecting a plan of adoption.

### DISCUSSION

" 'Once reunification services are ordered terminated, the focus shifts to the needs of the child for permanency and stability.'  [Citation.]  'A section 366.26 hearing . . . is a hearing specifically designed to select and implement a permanent plan for the child.'  [Citations.]"  (*In re Celine R.* (2003) 31 Cal.4th 45, 52.)  Section 366.26 provides a default rule favoring adoption.  (§ 366.26, subd. (c)(1).)  Once a child is likely to be

4

adopted, the court "shall terminate parental rights unless" one of several enumerated exceptions apply. (*Ibid.*; *In re C.F.* (2011) 193 Cal.App.4th 549, 553 [upon termination, burden shifts to parents to prove exception].)

At issue in this case is the exception for a beneficial parental relationship. This exception applies if the juvenile court "finds a compelling reason . . . termination would be detrimental to the child" because "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i); *In re C.F.*, *supra*, 193 Cal.App.4th at p. 553.)

Mother contends the juvenile court erred in not applying the exception. The County argues mother did not raise the exception before the juvenile court and cannot do so for the first time on appeal. County also argues, in any case, the trial court did not err in terminating rights and ordering adoption.

Given mother's failure to explicitly invoke the parental relationship exception, we first address the County's forfeiture argument. (See *In re Erik P.* (2002) 104 Cal.App.4th 395, 403 ["Allowing the father to raise the exception for the first time on appeal would be inconsistent with this court's role of reviewing orders terminating parental rights for the sufficiency of the evidence. Therefore, the father has waived his right to raise the exception."]; *In re Rachel M.* (2003) 113 Cal.App.4th 1289, 1295 ["Rosi did not raise this exception to adoption at the hearing below and thereby waived the right to raise the issue on appeal. The juvenile court does not have a sua sponte duty to determine whether an exception to adoption applies."].) Mother's attorney "argue[d] there is a sufficient bond here" to prevent adoption. County counsel, in response, argued there was insufficient evidence termination would be detrimental because of J.D.'s relationship with her mother. While mother's counsel should have more clearly invoked the beneficial parental relationship exception, it appears the juvenile court participants understood the exception was in play. We therefore conclude mother may raise the issue on appeal, and proceed to the merits.

In reviewing a juvenile court's decision as to the applicability of the parental relationship exception, we employ the substantial evidence or abuse of discretion

5

standards of review as appropriate.  (*In re K.P.* (2012) 203 Cal.App.4th 614, 622; *In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314–1315.)  We review factual determinations, such as the existence of a beneficial relationship, for substantial evidence.  (*In re Bailey J.*, *supra*, at p. 1314.)  However, a juvenile court's determination of questions such as whether, given the existence of beneficial parental relationship, there is a compelling reason for determining that termination of parental rights would be detrimental to the child is a quintessentially discretionary determination.  (*Id.* at p. 1315.)  We review such decisions for abuse of discretion.  (*Ibid.*)  In the dependency context, both standards call for a high degree of appellate court deference.  (*Ibid.*; *In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1351.)

To ascertain the existence of beneficial parental relationships, courts routinely consider " '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.'  [Citation.]" (*In re Amber M.* (2002) 103 Cal.App.4th 681, 689.)

The "parent must show more than frequent and loving contact or pleasant visits." (*In re C.F.*, *supra*, 193 Cal.App.4th at pp. 555, 558–559)  The parent must show that the "relationship promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents.  In other words, the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer.  If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575.)

Additionally, the parent must not only demonstrate the positive aspects of the relationship, but "must show the child would suffer detriment if his or her relationship with the parent were terminated." (*In re C.F.*, *supra*, 193 Cal.App.4th at p. 555.)  Indeed, for the exception to apply, severing of the relationship must " 'deprive the child of a

6

*substantial*, positive emotional attachment such that the child would be *greatly* harmed.' " (*In re Marcelo B.* (2012) 209 Cal.App.4th 635, 643.)  " 'A biological parent who has failed to reunify with an adoptable child may not derail an adoption merely by showing the child would derive *some* benefit from continuing a relationship maintained during periods of visitation with the parent.' " (*Ibid.*)

Mother failed to show severing the natural parent/child relationship would deprive J.D. of a substantial, positive emotional attachment such that the child would be greatly harmed.  That J.D. enjoyed visits from mother and that mother showed appropriate affection does not establish a beneficial parental relationship sufficient to defeat adoption.

This case is readily distinguishable from *In re Amber M.*, *supra*, 103 Cal.App.4th at pages 689–690, in which evidence from a bonding study psychologist, therapists, and a court advocate all demonstrated the exception's applicability.  According to the psychologist, the mother in *In re Amber M.* had established a " 'primary attachment' " and "primary maternal relationship" with her children, and there was no doubt the children, significantly older than J.D., viewed her as their mother and had a strong connection with her.  Further, that mother "did virtually all that was asked of her to regain custody." (*Ibid.*)   Here, there were no such studies and no evidence of detriment. J.D. has spent far more of her short life away from her biological mother than the children in *In re Amber M.*  Although mother believed J.D. called her "mama," the trial court credited social worker testimony and reports to the contrary.  Moreover, the mother here has done few of the things asked of her to regain custody of her child.  The juvenile court's conclusion it would be detrimental to J.D. to return the child to an environment of domestic violence is amply supported by the record.  (See *In re C.F.*, *supra*, 193 Cal.App.4th at p. 558 [mother's failure to remain sober and drug free a factor].)

This case is similarly unlike *In re S.B.* (2008) 164 Cal.App.4th 289, 298.  There, the father "was S.B.'s primary caregiver for three years.  In 2004 a social worker observed him parenting S.B. in a patient and loving manner.  When S.B. was removed from his care, [the father] immediately recognized that his drug use was untenable, started services, maintained his sobriety, sought medical and psychological services, and

maintained consistent and regular visitation with S.B.  He complied with 'every aspect' of his case plan." (*Ibid.*)  Further, S.B. showed "strong attachment" to her father and verbalized a desire for their relationship to continue and to live with father.  (*Ibid.*)  *In re S.B.* "is confined to its extraordinary facts," facts not present here.  (*In re C.F.*, *supra*, 193 Cal.App.4th at p. 558.)

Rather, this case is more like *In re C.F.*, *supra*, 193 Cal.App.4th at pages 554–559 and *In re Marcelo B.*, *supra*, 209 Cal.App.4th at pages 642–644, both of which affirmed termination of parental rights and rejected the beneficial parental relationship exception. As in *In re C.F.*, "[the mother] and the children had pleasant visits, and her daughter was sometimes sad to see them end" but "there is no bonding study or other evidence that shows [the mother] occupied a parental role in [her children's] lives, that they would suffer any actual detriment on the termination of parental rights, or that the benefits of continuing the parental relationship outweighed the benefits of permanent placement with family members who are ready to give them a permanent home." (*In re C.F.*, *supra*, 193 Cal.App.4th at p. 557.)  As in *In re Marcelo B.*, mother here may have shown "a warm and affectionate relationship with her" child during visits, but mother has "not demonstrated an ability to provide [her child], over the long term, with a stable, safe and loving home environment," due to mother's unresolved substance abuse and domestic violence issues. (*In re Marcelo B.*, *supra*, 209 Cal.App.4th at p. 644 ["Accordingly, the juvenile court properly found there was no beneficial parental relationship sufficient to overcome the statutory preference for adoption."].)

The juvenile court here properly considered all the facts before it, including the negative aspects of the mother/child relationship that remained unaddressed following failed reunification services, and its implicit rejection of the beneficial parental exception is amply supported by the record.

8

## DISPOSITION

The juvenile court's order terminating parental rights is affirmed.

_____
Banke, J.

We concur:

_____
Dondero, J. Acting P. J.


_____
Sepulveda, J.[*]

---

[*] Retired Associate Justice of the Court of Appeal, First Appellate District, Division Four, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

9