Filed 7/10/24  In re D. CA2/4

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FOUR

| | |
|---|---|
| In re D. et al., Persons Coming Under the Juvenile Court Law. | B327900 |
| | (Los Angeles County Super. Ct. Nos. 20LJJP00624 20LJJP00624 B, C) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | |
| Plaintiff and Respondent, | |
| v. | |
| B.B., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Donald A. Buddle, Jr., Judge.  Affirmed.

David M. Yorton, Jr., under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, Avedis Koutoujian, Deputy County Counsel, for Plaintiff and Respondent.

_____

## INTRODUCTION

Appellant Brittany B. (mother) appeals from a juvenile court order terminating her parental rights to two of her children, A. and D.  The children were removed from mother's care in October 2020, shortly after A.'s birth; D. was 23 months old.  At the termination of rights hearing under Welfare and Institutions Code section 366.26[1] in February 2023, the juvenile court held that that mother failed to demonstrate that the parental-benefit exception to adoption under section 366.26, subdivision (c)(1)(B)(i) applied.  Mother appealed.

We affirm.  Mother did not meet her burden to demonstrate that termination would be detrimental to the children under the parental-benefit exception.  Mother's visitation with the children was inconsistent and she did not show that the children would benefit from continuing the relationship.

## FACTUAL AND PROCEDURAL BACKGROUND

### A.  Detention

The children came to the attention of the Los Angeles County Department of Children and Family Services (DCFS) in September 2020, when mother tested positive for opiates and

_____

[1]   All further undesignated statutory references are to the Welfare and Institutions Code.

2

amphetamines at the time of A.'s birth.  Mother said she had used cocaine (but not amphetamines) the day before A. was born, and she took a Norco prescribed to someone else for back pain on the day A. was born.  Mother told hospital staff she did not know she was pregnant, and she received no prenatal care.  Mother told staff A. was her first baby, and that she was unable to care for her.  A second referral stated that mother's eight-year-old daughter, H., who is not at issue in this appeal, reported seeing mother smoking something with "a piece of glass," and seeing mother and A. and D.'s father (father) hitting and pushing each other.[2]

Mother checked out of the hospital against medical advice and she initially gave an incorrect name and address.  When the children's social worker (CSW) was able to locate mother at her home, mother gave a false name for D., 23 months old, and said she was caring for D. because D.'s mother had a drug problem and was living in Las Vegas.  Mother also said H. was her niece.  Mother said she and father were no longer in a relationship.

The CSW learned mother's and D.'s names when she called mother's acquaintance, who also told her that H. "mainly" lived with her father, N.G.  Another acquaintance told the CSW that mother had known she was pregnant since about two months into the pregnancy.  The CSW visited H. and N.G. at N.G.'s home.  N.G. said he had observed mother showing signs of drug use including weight loss, paranoia, and grinding her teeth.  N.G. also said mother had been diagnosed with bipolar disorder.  H. reported that she heard mother talking about being pregnant. H.

_____

[2]     Mother initially refused to provide any information about A.'s father, and father initially asserted that A. was not his child. A DNA test later confirmed father's paternity.

3

had also observed mother smoking out of a pipe and drinking alcohol. H. said mother yells at her every day, and she had observed mother and father hitting and throwing things at each other.

Father told the CSW he knew mother was pregnant, but he did not think the baby was his. After a 2019 arrest for domestic violence, mother had a criminal restraining order against father; father said mother was the aggressor. He also said mother had stalked him and taken over his social media accounts. Father said he occasionally cared for D. DCFS history showed reports of domestic violence between mother and father in May, June, and July 2020.

A. remained in the hospital due to medical complications. Mother threatened to take A. from the hospital against medical advice, and a hospital hold was placed on her. D. was also removed from mother's care on October 1, 2020. D. was placed with a paternal aunt, N.H. (aunt); A. was placed with aunt when she was discharged from the hospital a few days later.

On October 5, 2020, DCFS filed a petition under section 300, subdivisions (a), (b), and (j). Counts a-1 and b-3 alleged that mother and father had a history of engaging in violent altercations, including while mother was pregnant and while father was living with mother despite the restraining order. Counts b-1 and j-1 alleged that mother used illicit drugs while caring for the children and while pregnant. Counts b-2 and j-2 alleged that father abused illicit drugs, and mother failed to protect the children by allowing father to have unlimited access to the children. Count b-4 alleged that mother had a history of bipolar disorder and failed to take her prescribed medications. On October 9, 2020, the juvenile court found a prima facie basis

4

for jurisdiction under section 300, found father to be the alleged father of A., ordered the children detained, and ordered that mother's visits be monitored.[3]

## B.  Jurisdiction and disposition

According to the jurisdiction/disposition report filed on November 4, 2020, D. and A. remained with aunt and her family, and H. remained with her father, N.G.  The bases for jurisdiction are not challenged in this appeal, so we do not discuss them in depth.

Mother initially refused to be interviewed by the dependency investigator.  H. reiterated her earlier statements about seeing and hearing violent altercations between mother and father, and seeing mother smoke using glass pipes.  Father confirmed arguments with mother and some physical altercations, but he said mother was the aggressor.  N.G. and father both confirmed that mother said she had been diagnosed with bipolar disorder; father said mother did not like to take her medication because it made her drowsy. DCFS found a high potential for future risk of abuse and neglect.

D. and A. were adjusting well in aunt's home.  A hospital report stated that A. tested positive for amphetamine and methamphetamine at birth; after her seven-day hospital stay, she was discharged in good health.  Mother was visiting D. and A. once per week for three hours.  Although mother was entitled to additional visits, DCFS had difficulty finding monitors for

---

[3]  The court also ordered monitored visits for father.  The court later sustained the petition as to father and ordered reunification services, but father did not participate.  His parental rights were also terminated; he does not challenge that ruling.

mother's visits. Mother also requested separate visitation days for each child.

A supplemental report filed November 18, 2020 stated that the dependency investigator interviewed mother by phone. Mother confirmed some of the domestic violence allegations with father. She denied any drug abuse, saying that she used cocaine shortly before giving birth because she did not know she was pregnant, but she did not use any other drugs. Mother denied that H. saw her smoking from a glass pipe. Mother also confirmed that she had been diagnosed with bipolar disorder, but said she did not take or need medication. Mother tested negative for drugs on November 3, 2020.

A last-minute information (LMI) filed December 15, 2020 stated that mother continued to have weekly visitation with the children. The LMI stated that aunt was not comfortable monitoring mother's visits because "mother gets upset easily, uses foul language, and has displayed disrespectful behaviors toward [aunt]." The LMI also stated that "mother often references her attorney as a reason to not comply, or come to an agreement, with the Department. As a result, servicing the mother's case has been difficult for [the CSW] and the Department overall. [The CSW] explained that the mother often times 'texts bizarre things' raising additional concerns for mother's mental health status. [The CSW] is unable to have a meaningful conversation with the mother as the mother speaks over [the] CSW while talking and becomes irate."

A drug test on December 2, 2020 was negative. However, the CSW received information that mother had purchased clean urine to use for her drug test, and that mother was a daily methamphetamine user. An LMI filed on January 13, 2021

stated that mother was having two monitored visits with the children per week. No concerns were noted.

At the jurisdiction hearing on January 15, 2021, the juvenile court found true counts b-1 and j-1 (relating to mother's drug abuse), b-3 (domestic violence), b-4 (mother's bipolar disorder), and j-2 (father's drug abuse). The court dismissed counts a-1 (serious physical harm due to domestic violence) and b-2 (father's drug abuse).

At the disposition hearing on February 26, 2021, the juvenile court released H. to N.G. and terminated jurisdiction as to H. The court ordered that D. and A. remain detained from mother and father, and ordered nine hours of monitored visitation for mother per week.

## C. Reunification period

A status review report filed August 25, 2021 stated that D. and A. remained with aunt and her family; D. and A. were "well adjusted in the home and have formed bonds with the caregiver's biological children." DCFS noted, "The children are to be referred to Regional Center Services however the mother has not signed the appropriate consent forms in order to evaluate the children. . . . The mother has stated that her children are developmentally well and not in need of services."

Mother was "consistent with her monitored visits" three times per week, and the visits were "reported to go well with recommendations for improvement." One visit per week was monitored by the CSW, one was monitored by a human services aid (HSA), and one was monitored by a professional monitor. The HSA had "provided mother with advice as how to be more interactive and more alert with both children in the visits." The CSW observed that "it is difficult for the mother to balance a two-

7

year-old and a 11-month year old during visits, but the mother tries and continues to attempt to provide equal attention to them."

Mother had "completed domestic violence, mental health assessment, individual counseling, and parenting," but "has yet to complete a full substance abuse program with after care." Mother had missed seven drug tests. DCFS noted that it was "concerned [about] the mother's unwillingness to participate and accept services pertaining to the issues that brought her to attention of DCFS. Her reluctance and ability to fabricate information continues to be a barrier for her reunification. Mother refuses to accept how her past issues of substance abuse lead [*sic*] to her involvement with DCFS." DCFS assessed that the risk of potential for negligence with mother remained high, and recommended that the court terminate reunification services.

An LMI filed on September 16, 2021 stated that aunt was "frustrated" with mother's visitation "because the mother sometimes does not confirm on time, visit is changed, or canceled." Mother still had not enrolled in a drug program.

Visit notes by the CSW from March 4, May 20, June 3, July 19, and August 9, 2021 noted no concerns with mother's visits, and said mother interacted with the children appropriately. However, a note from August 10, 2021 stated that the HSA found that mother's visits involved "no immediate concerns but . . . the mother needs improvement in her visits. The mother sometimes doesn't watch the children and HSA feels like she is watching the children." On one occasion when D. fell at a play area, mother neither saw the fall nor checked on D. afterward. Mother also "just leaves [A.] in the stroller. The child walks and [the HSA] would have never known she walks until the caregiver told her."

The HSA noted that there was "no doubt [mother] loves her kids and her kids love her but she needs improvement in the quality of her visits."

At the status review hearing on August 26, 2021, the juvenile court denied DCFS's request to terminate reunification services for mother. The court found that mother was in partial compliance with her case plan, and that she made efforts to comply with the remaining parts of the case plan.

A status review report filed December 14, 2021 stated that mother had enrolled in a drug program and was attending consistently. In November 2021, mother had asked that DCFS liberalize her visitation to be unmonitored. DCFS denied the request, stating that mother had only been in her drug program for a month, and mother was not in compliance with other parts of her case plan. DCFS again recommended that reunification services be terminated.

An Evidence Code section 730 psychological evaluation for mother was filed December 9, 2021. The clinical/diagnostic impressions were bipolar I disorder with rapid cycling, mild; stimulant use disorder, severe; and relationship distress with intimate partner. The psychologist noted, "Overall, [mother's] profile is not considered in the clinical range. She tended to deny most symptoms." The psychologist recommended continued jurisdiction while mother completed her case plan.

An LMI filed January 13, 2022 noted that mother's recent drug tests were negative. However, DCFS had "received some concerns regarding the mother's behavior," including an allegation that mother was "neglecting her elderly grandfather. It was further observed in the conversations that the mother left the grandfather for a week and traveled outside of the state to

meet a man and it was alleged that she was using illicit drugs." Mother denied the allegations.

A service log filed as an exhibit on January 25, 2022 included notes about mother's visits by the CSW and HSA who monitored mother's visits. A visit note by the CSW from October 6, 2021 noted no concerns. A visit note by the CSW from December 1, 2021 stated that D. did not want to leave home for the visit with mother. At the visit she was whiny, and said, "I miss mommy," referring to aunt. Aunt told the CSW that mother set up a visit for 10:00 a.m. on Thanksgiving, but did not show up and did not text again until 5:45 p.m. Aunt "expressed her frustration of how she tries to accommodate visits on special holidays and occasions and the mother doesn't show up and she always has an excuse." Mother was supposed to attend a dental visit for the children on December 16, 2021; mother did not attend and did not text aunt.

A visit note by the CSW from January 5, 2022 stated that D. cried and did not want to go to the visit. The CSW noted that during the visit mother "struggle[d] in attending to both children," but stated that it was understandable because both children were under the age of three. The note stated, "The children are observed to have a bond with mother; however the children don't seem to not want to stay [sic]. The children don't cry or don't say that they don't want to leave at the end of the visit."

On January 13, 2022, the HSA told the CSW that "she continues to have concerns about the mother. [The HSA] says that the mother has no patience for the children, and . . . favors one child more than the other. The mother tends to favor the child [D.] who is three rather than the child [A.] who is [one].

The HSA stated that both of them were acting up and [D.] didn't get in trouble but [A.] was put in the car seat as punishment." The HSA also noted that D. "cries when she has to go to the visit," and "is always crying that she does not want to go." The HSA observed that mother "loves her children but she lacks parental insight" and is "moody" at visits.

An LMI filed on February 8, 2022 stated that mother had missed three appointments to take a hair follicle drug test. Mother claimed that she missed one test because she was in the emergency room, but when the CSW called the hospital to verify, the hospital said mother had not been there since 2015. The CSW reported that on February 7, 2022, she had "received text messages from an anonymous source claiming that mother had plans to tamper with the hair follicle test and further indicated that mother has been falsifying urine tests and continues to use illicit substances." DCFS continued to recommend that reunification services be terminated.

An LMI filed on March 8, 2022 noted that mother had become more inconsistent in her visitation. Mother had cancelled visits on February 3, 10, and 24, and March 3, and she was so late to the February 23 and March 2 visits that the visits were cancelled. The CSW set up a meeting with mother and a supervisor to address the missed visits, but mother canceled the meeting. In addition, mother had missed two additional appointments for a hair follicle test.

An LMI filed March 15, 2022 stated that the meeting with mother occurred on March 9 by phone. Mother was told that she needed to confirm with the monitors an hour before each visit that she was at the visit location, and once confirmed, the

11

monitors would go to pick up the children. DCFS recommended that mother's visits be reduced to one three-hour visit per month.

At a review hearing on March 16, 2022, the juvenile court terminated reunification services. The court found that mother failed to make substantial progress, and the children would not be returned to her care by the 18-month mark, which would occur within weeks of the hearing. The court set a hearing under section 366.26 regarding termination of mother's parental rights. The court also rejected DCFS's request that mother be ordered to confirm her visits one hour beforehand, and instead adopted mother's request that she confirm only a half hour before each visit.

Mother filed a motion requesting a bonding study. After a hearing, the juvenile court denied the motion. This court affirmed that ruling. (*In re D.B.* (Aug. 31, 2023, B320301) [nonpub. opn].)

**D.    Termination of parental rights**

A section 366.26 report filed June 28, 2022 stated that D. and A. remained in the care of aunt and her family. The report noted that DCFS tried to serve mother notice of the section 366.26 hearing at a visit, but was unable to because mother did not show up to several visits in a row. The permanency plan for the children was adoption by aunt and her husband. DCFS requested additional time to do an adoptive home study.

Mother was having two visits with the children per week: on Wednesdays, monitored by the CSW, and on Thursdays, monitored by the HSA. DCFS noted that "mother has a pattern of inconsistently arriving on time to visits or not showing to the visits after confirming." The HSA observed that mother "has no patience for the children" and is "moody" at visits. The HSA also

observed that D. "cries when she has to go to the visit and often has to be bribed to attend visits." The report continued, "It is the HSA's observation[ ] that there is no bond between the mother and children."

The CSW noted that on April 6, 2022, mother met the CSW and children at the library. Mother interacted with the children, but "mother's demeanor demonstrated that she did not want to be there." Mother kept A. in her stroller for the entire visit, rather than letting her walk or run around. On May 11, 2022, the CSW noted that "mother has more of a bond with [D.] than [A.]. The mother payed [*sic*] more attention to [D.] by carrying her and leaving [A.] in the car seat." Mother had a visit with D. on June 1, 2022; A. was ill. No concerns were noted. Mother did not have any additional visits with the children in June, because "mother does not confirm the visit or she confirms and is a no show."

A supplemental report filed August 25, 2022 stated that the children were likely to be adopted by aunt's family, and recommended termination of mother's parental rights. A status review report filed on September 7, 2022 stated, "Mother's visits are inconsistent. The court ordered the mother to be at the location 30 minutes early prior to the visit starting. The mother does not show up on time and visits continue to be canceled. The mother has not showed for the Thursday visits with [the HSA] in over two months. The mother confirms her visits but does not call thirty minutes before and does not show up to the visits."

In October 2022, mother filed a request to make up visits that were missed while the CSW was on leave for two months. Mother also requested that visits be in her home, instead of at the library. The request said nothing of the missed visits with the HSA.

At a hearing on November 7, 2022, DCFS asked again that the court require mother to confirm appointments 60 minutes in advance; otherwise, the monitors had to go to the children's home and get them ready to leave, only to find out that mother did not confirm the visit, which was burdensome for the monitors and confusing for the children. Counsel for the children agreed, stating, "I would note that really all of the restrictions on mother's visits have been due to the mother's lack of consistency with visitation and canceling the visits on time and the disruption this has caused for the caregivers and for the minors." Regarding whether visits could occur in mother's home, DCFS noted that mother said throughout the case that she was not using drugs, but the results of a drug test taken on March 8, 2022, which were filed on November 7, 2022, showed that mother tested positive for methamphetamine. DCFS noted that mother's use of drugs could expose the children to substances or paraphernalia in her home, so for safety reasons the visits should remain in a neutral location.

The court agreed that previous changes to mother's visitation "were due to her lackluster appearance at visitation," and ordered mother to confirm visits one hour beforehand. The court also ordered DCFS to "provide an update that includes Caden C.,[4] Parent's [*sic*] progress, visitation and any changes in recommendation."

Also on November 7, 2022, mother filed a request to reinstate reunification services. The court set a hearing to

---

[4]     We presume the court was referring to the elements relevant to the parental-benefit exception, as discussed in *In re Caden C.* (2021) 11 Cal.5th 614 (*Caden C.*). See the Discussion section, *infra*.

determine whether to grant an evidentiary hearing.  DCFS filed a response to mother's request on December 6, 2022.[5]  It stated that an investigator scheduled a meeting with mother on December 2, but mother did not show up. Mother returned the investigator's call later that day, and an interview was completed by phone.  Mother said she did not know how the March 8 drug test was positive.  Mother also said that her visits with the children are good, and she had complied with her case plan.

Aunt said mother's visits were sporadic, and since mother had not been showing up for visits, the visits had been reduced to one day per week.  Mother had cancelled visits on November 3, November 27, and December 1.  Due to mother's multiple cancellations, the HSA was requiring mother to contact the HSA by a video call to confirm she was at the visit location before the HSA would go to pick up the children.

D. told the DCFS investigator that she likes to visit mother, and she likes living with "mommy and daddy" (aunt and her husband).  A. also called the caregivers mommy and daddy.  The CSW handling the case told the investigator that mother was "not consistent with her visits.  [Mother's] bond with the children is not there.  She dismisses the children's feelings. [D.] would say 'at mommy's house' (referring to the caregiver) and [mother] would just tell her 'she is not your mommy' then [D.] would fight back and say 'I have two mommy's' [*sic*] and she will continue to argue with the child and tell her No; completely dismissing her feelings.  There was a hair follicle test ordered when they terminated reunification.  The hair follicle test is paid for and all

---

[5]     Much of this information is repeated in DCFS's LMI filed on December 7, 2022, in response to the court's request for information relevant to the *Caden C.* considerations.

15

she has to do is go take it and she continues to refuse to take the hair follicle test."

The CSW added that sometimes the children do not want to go to visits: "They often cry and cling on the caregiver stating they do not want to go.  Sometimes it takes some bribing from the caregiver for them to go.  Does [D.] love her mother, of course she is able to recognize who her mother is, but detaches easily after the visit is over.  [D. does not] cry when visits end . . . .  As far as [A.] there is no bond as [A.] is not able to fully identify that it is her mom, she was detained at birth and that bond was not fully formed in the two years that the children have been detained from her care."

The HSA agreed that mother "is not consistent with visitations.  [Mother] confirms for her Thursday visit early in the week but then, very often, is a no show to her visitations.  [Mother] has shown strange behavior, as in . . . calling me on a Sunday evening, and texting to confirm her visit the day before Thanksgiving[ ] after having been told the office would be closed on the Thursday of Thanksgiving."  The HSA also stated that mother "seems as though she has difficult time being aware of both of her daughters," because she pays attention to only one at a time while ignoring the other.  The HSA said that mother is "affectionate with the girls making sure she tells them she loves them at the end of visitations."

DCFS recommended that the court deny mother's petition to reinstate reunification services.  It stated that although mother had "worked towards addressing all the Court ordered case services, she still has not demonstrated any significant changes in her protective capacity or ability to care for" D. and A.

16

At the section 366.26 hearing on December 12, 2022, the court denied mother's request to reinstate reunification services, finding no change in circumstances. Turning to section 366.26, mother asserted a new claim that her family had Indian ancestry warranting investigation by DCFS. The court therefore continued the hearing.

An LMI filed on February 15, 2023 noted as a "Caden C. factor" that D. and A. "can get a little clingy before family time visits with their mother and sometimes will cry prior to the visits when they do not want to go. [Aunt] said the last visit mother did not show up to and visits tend to be inconsistent. . . . [Aunt] worries that the inconsistency will cause more harm to the girls." Mother had missed visits on January 19 and 26 due to illness and car problems, and was late on February 9. The CSW said "mother's visits continue to be inconsistent although she confirms her visits and then is a no show."

At the section 366.26 hearing on February 23, 2023, mother testified that sometimes her visits get canceled if she is "one minute late, two minutes late." Mother said she visits with the children once per week, monitored by the HSA. Mother testified, "[D.] asks me, 'Mommy, can I come home? Why can't I go home with you?' And I tell her why. And I give [A.] a kiss. She gives me a kiss and a hug." Mother further testified, "[M]y kids have a really close bond. And I really think it would be very detrimental to them to not see me, because also the caregiver and I do not get along. And I know that if I get terminated [*sic*], I will not see my kids until they are 18. And it would be really, really . . . upsetting to both parties, to me and my children."

Mother's counsel asked the court to apply the parental-benefit exception to adoption, asserting that mother had

maintained regular visitation and the children would benefit from maintaining a regular relationship with mother. The children and DCFS argued that mother did not meet the requirements for the parental-benefit exception, and asserted that mother's parental rights should be terminated.

The court said, "The court has read and considered the reports. The court does note that . . . there was a much to-do [*sic*] about the social workers and the department, but the [HSA] also noted . . . that mother was not consistent with visits." The court continued, "The court finds by clear and convincing evidence that the children are adoptable, and there are no legal impediments to adoption. [¶] The court finds that the parents have not maintained regular visitation with the children and have not established a bond with the children. [¶] The court finds that any benefit accruing to the children from the relationship with the parents is outweighed by the physical and emotional benefit the children will receive through the permanency and stability of adoption and that adoption is in the best interest of the children." The court therefore terminated mother's parental rights.

Mother timely appealed.

## DISCUSSION

Mother asserts the trial court erred in finding that the parental-benefit exception did not apply. We find no error.

## A.    Legal authority

Children have "compelling rights . . . to have a placement that is stable, permanent, and that allows the caretaker to make a full emotional commitment to the child." (*In re Marilyn H.* (1993) 5 Cal.4th 295, 306.) "The objective of the dependency scheme is to protect abused or neglected children and those at substantial risk thereof and to provide permanent, stable homes

18

if those children cannot be returned home within a prescribed period of time." (*Id*. at p. 307.) "[W]here possible, adoption is the first choice. 'Adoption is the Legislature's first choice because it gives the child the best chance at [a full] emotional commitment from a responsible caretaker." [Citation.] 'Guardianship, while a more stable placement than foster care, is not irrevocable and thus falls short of the secure and permanent future the Legislature had in mind for the dependent child.'" (*In re Celine R*. (2003) 31 Cal.4th 45, 53.)

Thus, at a section 366.26 hearing, "the court shall terminate parental rights unless" one of the statutory exceptions applies. (§ 366.26, subd. (c)(1).) "The statutory exceptions merely permit the court, in *exceptional circumstances* [citation], to choose an option other than the norm, which remains adoption." (*In re Celine R., supra*, 31 Cal.4th at p. 53 (emphasis in original).) One of the statutory exceptions is the parental-benefit exception, which applies when "[t]he court finds a compelling reason for determining that termination would be detrimental to the child" where "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).) "[T]he exception applies in situations where a child cannot be in a parent's custody but where severing the child's relationship with the parent, even when balanced against the benefits of a new adoptive home, would be harmful for the child." (*Caden C., supra*, 11 Cal.5th at p. 630.)

There are "three elements the parent must prove to establish the [parental-benefit] exception: (1) regular *visitation and contact*, and (2) a *relationship*, the continuation of which would *benefit* the child such that (3) the termination of parental

rights would be *detrimental* to the child." (*Caden C., supra*, 11 Cal.5th at p. 631 (emphasis in original).) In other words, "the parent asserting the parental benefit exception must show, by a preponderance of the evidence, three things. The parent must show regular visitation and contact with the child, taking into account the extent of visitation permitted. Moreover, the parent must show that the child has a substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship. And the parent must show that terminating that attachment would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home. When the parent has met that burden, the parental-benefit exception applies such that it would not be in the best interest of the child to terminate parental rights, and the court should select a permanent plan other than adoption." (*Id.* at pp. 636-637.)

We review the court's determination on the first two elements for substantial evidence; the third element "is discretionary and properly reviewed for abuse of discretion." (*Caden C., supra*, 11 Cal.5th at pp. 639-640.) However, where, as here, a parent contends the court erred in finding she did not meet her burden of proof, we must determine whether "the evidence compels a finding in favor of the appellant as a matter of law. [Citations.] Specifically, the question becomes whether the appellant's evidence was (1) 'uncontradicted and unimpeached' and (2) 'of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding.' [Citation.]" (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1528, disapproved on another ground in *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1003, fn. 4, 1010, fn. 7.)

## B.     Consistency of visitation

"The first element—regular visitation and contact—is straightforward.  The question is just whether 'parents visit consistently,' taking into account 'the extent permitted by court orders.'" (*Caden C., supra*, 11 Cal.5th at p. 632.)

Mother asserts she "maintained regular visitation with her children as best she could," blaming missed visits on "obstacles placed before her by DCFS" and the children's caregiver.  She argues that based on the entire record, beginning in 2020, her visits were consistent enough to meet the *Caden C.* standard.

We are not persuaded.  Although mother's visits were consistent at the beginning of the case in 2020, her visits became very inconsistent over time.  Mother missed visits on February 3, 10, 23, and 24, and March 2 and 3, 2022.  She only had a single visit with the children in June 2022, despite being allowed two visits per week.  The status review report filed on September 7, 2022 stated that mother had not showed up for her Thursday visits in more than two months.  Additional visits were cancelled on November 3, November 27, and December 1, 2022, and January 19 and 26, 2023.  The CSW, the HSA, and the children's caregivers each reported that mother's visits were inconsistent.  Mother therefore did not meet this element.  (See, e.g., *In re C.F.* (2011) 193 Cal.App.4th 549, 554 ["Sporadic visitation is insufficient to satisfy the first prong of the parent-child relationship exception to adoption"].)

Mother argues that the juvenile court's ruling was not clear about whether she met this element, and therefore mother "is left with not knowing what the juvenile court relied upon in making its findings regarding" the first element.  Mother points to no legal authority requiring the court to specify in its order which

21

parts of the record demonstrate irregular visitation. Moreover, the record here makes clear that mother's visitation was inconsistent, leaving no question as to whether this element was met. Mother therefore has not demonstrated error with respect to the first element.

## C.    Benefit of continuing the relationship

For the second element, "courts assess whether 'the child would benefit from continuing the relationship.' (§ 366.26, subd. (c)(1)(B)(i).) Again here, the focus is the child. And the relationship may be shaped by a slew of factors, such as '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.' [Citation.] [In addition,] courts often consider how children feel about, interact with, look to, or talk about their parents." (*Caden C., supra*, 11 Cal.5th at p. 632.)

Mother asserts that D. and A. were bonded to her, citing only a note by the CSW from January 5, 2022 and mother's own testimony. The record does not support mother's contention.

D. was 23 months old when she was removed from mother, and A. had been removed from mother since birth. The only relationship the children had with mother after removal consisted of a few hours of supervised visits per week. The January 5 note mother relies upon did mention a bond between mother and the children, but it also stated that D. cried because she did not want to go to the visit and "[t]he children don't cry or don't say that they don't want to leave at the end of the visit." The visit notes for December 1, 2021 and January 13, 2022 also stated that D. cried and did not want to go to the visit with mother. The HSA observed in June 2022 that D. "cries when she

has to go to the visit and often has to be bribed to attend visits," while mother "has no patience for the children" and is "moody" at visits. The HSA observed "no bond between the mother and children." In December 2022, the CSW observed again that the children sometimes cry and say they do not want to go to visits with mother, and "[s]ometimes it takes some bribing from the caregiver for them to go." D. continued to "detach[ ] easily after the visit is over," while A. had no bond at all, having been detained from mother since birth.

Thus, although the children often enjoyed visiting mother, the evidence does not demonstrate the existence of a relationship between mother and the children that was beneficial to the children.

## D.    Detriment of termination of parental rights

For the third element, the court considers whether the termination of parental rights would be detrimental to the child. (*Caden C., supra*, 11 Cal.5th at p. 631.) In determining whether termination would be detrimental, "the question is . . . whether losing the relationship with the parent would harm the child to an extent not outweighed, on balance, by the security of a new, adoptive home." (*Id*. at p. 634.) "Because terminating parental rights eliminates any legal basis for the parent or child to maintain the relationship, courts must assume that terminating parental rights terminates the relationship. [Citations.] What courts need to determine, therefore, is how the child would be affected by losing the parental relationship—in effect, what life would be like for the child in an adoptive home without the parent in the child's life." (*Id*. at p. 633.)

Mother asserts this element has been met, again asserting that the children were bonded with her. The record does not

support this contention, and nothing in the record suggests D. and A. would be detrimentally affected by having mother's rights terminated and being adopted by aunt's family. The children were well bonded to aunt's family, they called aunt and her husband mommy and daddy, and they bonded to aunt's other children. D. and A. were well-adjusted and thriving in aunt's home—the only home A. had ever known.

This case is not similar to *In re D.M.* (2021) 71 Cal.App.5th 261, one of the cases mother cites. In that case, without the clarification the Supreme Court later provided in *Caden C.*, the juvenile court erroneously considered the extent to which father played a parental role in the children's lives. (*Id.* at pp. 270-271.) The record there also showed that father visited his three children consistently, and "the youngest child cried when visits concluded. D.M. had lived with father for nearly eight years of her young life, R.M. for nearly five years, and I.M. for nearly two years, in an intact family where father was a breadwinner and custodial parent." (*Id.* at p. 271.) The Court of Appeal said it could not "know how the court would have exercised its discretion if it had the benefit of the *Caden C.* analysis when making its ruling," and therefore remanded the matter for a new section 366.26 hearing. (*Ibid.*)

Mother also relies on *In re J.D.* (2021) 70 Cal.App.5th 833, a similar case in which the juvenile court's decision pre-dated *Caden C.* The Court of Appeal noted that the mother met the first element regarding visitation, but regarding the second and third elements, "the juvenile court's ruling cannot be affirmed on this record, because we cannot be certain the juvenile court did not consider factors disapproved of in *Caden C.*" (*Id.* at p. 854.) The Court of Appeal also discussed the "abundant evidence that

24

[the child's] attachment to [his] mother continued throughout the case," even as their visits were limited due to the Covid-19 pandemic. (*Id*. at p. 855.) As in *In re D.M.*, the Court of Appeal remanded the matter for a new section 366.26 hearing. (*Id*. at p. 871.)

Here, by contrast, the juvenile court specifically considered the *Caden C*. elements, and the record does not support a finding that the children would be harmed by the loss of a relationship with mother, or that such harm would outweigh the benefit the children would receive from the security and stability of adoption. Moreover, unlike the parents in *In re D.M.* and *In re J.D.*, mother did not meet the first element regarding consistent visitation. Mother therefore has not demonstrated that the juvenile court erred in finding that the parental-benefit exception does not overcome the legislative preference for adoption.

## DISPOSITION

The juvenile court's order is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

COLLINS, J.

We concur:

CURREY, P. J.                                        MORI, J.

25