Filed 7/1/25  In re P.L. CA2/4

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(a). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115(a).

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re P.L. et al., Persons Coming Under the Juvenile Court Law. | B341359 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> M.D., <br><br> Defendant and Appellant. | Los Angeles County Super. Ct. No. 20CCJP03856 |

APPEAL from an order of the Superior Court of Los Angeles County, Linda L. Sun, Judge. Affirmed.

Carol A. Koenig, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, Jessica S. Mitchell, Senior Deputy County Counsel, for Plaintiff and Respondent.

## INTRODUCTION

M.D. (mother) appeals from the juvenile court's order terminating her parental rights with respect to minors, P.L. and S.L., under Welfare and Institutions Code[1] section 366.26. She argues the juvenile court committed reversible error by (1) finding inapplicable the parental benefit and sibling relationship exceptions to adoption; and (2) failing to clarify in its findings whether it had relied on a bonding study performed by Dr. Ronald Banks. We affirm.

## BACKGROUND[2]

In addition to P.L. and S.L., mother and non-party J.L. (father) have two minor sons, I.L. and O.L. I.L. was born in March 2015, O.L. was born in May 2016, P.L. was born in November 2018, and S.L. was born in September 2020. This appeal only concerns the juvenile court's termination of mother's parental rights with respect to P.L. and S.L.

In late 2020, the juvenile court declared all four minors dependents of the court and removed them from their parents' care. The court found that the minors were at risk of harm due to

---

1    All undesignated statutory references are to the Welfare and Institutions Code.

2    The parties are familiar with the facts and procedural history of the case, so we do not fully restate those details here. (*People v. Garcia* (2002) 97 Cal.App.4th 847, 851 [unpublished opinion merely reviewing correctness of juvenile court's decision "does not merit extensive factual or legal statement" (fn. omitted)].) Additional facts are discussed as needed in the Discussion section, *infra*.

father's physical abuse of I.L. and O.L. and mother's failure to protect her sons from father's abuse.[3]

On April 5, 2023, mother reunified with all four children. By this time, the parents were no longer in a relationship, and mother became the children's sole caregiver. Less than two months later, on May 31, 2023, the Department of Children and Family Services (DCFS) re-detained the children from mother, at her request. Mother reported feeling "extremely overwhelmed" with having all the children in her care, "to the point where she . . . [felt she] was about to pass out." She was frustrated that the children did not listen to her. Mother was also concerned about her ability to provide the children with sufficient food.

In June 2023, DCFS filed a subsequent section 342 petition, alleging the children were at risk of harm due to mother's inability to provide them with ongoing care and supervision. Two months later, the juvenile court sustained the petition as pled, declared the children dependents of the court under section 300, subdivision (b), and removed them from mother. With respect to P.L. and S.L., the court declined to grant mother further reunification services and set a permanency planning hearing under section 366.26.

The juvenile court conducted the section 366.26 hearing over three days, between September and October 2024. Ultimately, after receiving evidence and hearing argument, the juvenile court terminated both parents' parental rights with respect to P.L. and S.L. In so ruling, the court determined

---

3 On October 1, 2020, the juvenile court declared the oldest three children, I.L., O.L., and P.L., to be dependents. On December 10, 2020, the juvenile court so found with respect to the youngest child, then-two-month-old, S.L.

3

mother failed to demonstrate that the parental benefit and/or sibling relationship exceptions to adoption applied.

Mother timely appealed.

## DISCUSSION

"By the time of a section 366.26 hearing, the parent's interest in reunification is no longer an issue and the child's interest in a stable and permanent placement is paramount." (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1348, disapproved on another ground in *In re Caden C.* (2021) 11 Cal.5th 614, 636 (*Caden C.*).) "At that hearing, the court determines whether to terminate parental rights, making way for adoption, or to maintain parental rights and select another permanent plan." (*Caden C.*, *supra*, 11 Cal.5th at p. 625.)

"'Adoption is the Legislature's first choice because it gives the child the best chance at [a full] emotional commitment from a responsible caretaker.' [Citation.]" (*In re Celine R.* (2003) 31 Cal.4th 45, 53.) Thus, if the court finds the child is adoptable, it "must order adoption and its necessary consequence, termination of parental rights, unless one of the specified circumstances [set forth in section 366.26] provides a compelling reason for finding that termination of parental rights would be detrimental to the child. The specified statutory circumstances—actually, *exceptions* to the general rule that the court must choose adoption where possible—'must be considered in view of the legislative preference for adoption when reunification efforts have failed.' [Citation.]" (*Ibid.*)

On appeal, mother argues the juvenile court erred by finding inapplicable to her case two of the exceptions to adoption set forth under section 366.26, for (1) parental benefit (§ 366.26, subd. (c)(1)(B)(i); see *Caden C.*, *supra*, 11 Cal.5th 614, 631); and

4

(2) sibling relationship (§ 366.26, subd. (c)(1)(B)(v); see *In re D.O.* (2016) 247 Cal.App.4th 166, 173.)  We address each exception in turn.

## I.     Parental Benefit Exception

### A.     Governing Principles and Standard of Review

In *Caden C.*, *supra*, 11 Cal.5th 614, our Supreme Court identified three elements that a parent must prove by a preponderance of the evidence to establish the parental benefit exception under section 366.26, subdivision (c)(1)(B)(i): (1) "regular visitation and contact with the child, taking into account the extent of visitation permitted"; (2) "that the child has a substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship"; and (3) "that terminating that attachment would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home."  (*Caden C.*, at p. 636.)

We review the juvenile court's findings on the first two elements of the *Caden C.* test for substantial evidence.  (*Caden C.*, *supra*, 11 Cal.5th at p. 639.)  In reviewing the third element, we apply a "hybrid standard."  (*Id.* at p. 641.)  "[T]he ultimate decision—whether termination of parental rights would be detrimental to the child due to the child's relationship with his [or her] parent—is discretionary and properly reviewed for abuse of discretion."  (*Id.* at p. 640.)  But any factual determinations made in support of that decision are reviewed for substantial evidence.  (*Ibid.*)

**B.    Analysis**

The parties do not dispute that mother satisfied the first element of the *Caden C.* test by demonstrating that she visited P.L. and S.L. consistently and to the extent permitted throughout the time of their removal.  Rather, the issue on appeal is whether the juvenile court erred in finding that mother did not satisfy the second and third elements of the *Caden C.* test.  We address each element in turn.

As noted above, to satisfy the second element of the *Caden C.* test, "the parent must show that the child has a substantial, positive, emotional attachment to the parent" such that "the child would benefit from continuing the relationship." (*Caden C.*, *supra*, 11 Cal.5th at p. 636.)  In evaluating this element, "the focus is the child.  And the relationship may be shaped by a slew of factors, such as '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.' [Citation.]" (*Id.* at p. 632.)  "[C]ourts often consider how children feel about, interact with, look to, or talk about their parents." (*Ibid.*)  To carry the burden on this element, a parent "must show more than frequent and loving contact or pleasant visits." (*In re C.F.* (2011) 193 Cal.App.4th 549, 555; *In re G.H.* (2022) 84 Cal.App.5th 15, 25 ["Friendly or affectionate visits are not enough"].)

Here, the juvenile court determined that "the children are not likely to benefit from continuing the[ir] relationship [with mother] because they are not particularly bonded to [her]." Specifically, based on the evidence it deemed credible,[4] the court

---

4      In making its findings on this element, the juvenile court found "the testimony of . . . mother and the [children's] paternal

6

found that mother's relationship with P.L. and S.L. consisted only of "pleasant visits and some emotional connection." As discussed below, the juvenile court's findings are supported by substantial evidence.

The record reflects that P.L. and S.L. had a fairly positive, though not particularly close, relationship with mother. Both P.L. and S.L. have spent most of their lives removed from mother and in foster care. P.L. was detained from mother as an 18-month-old. S.L. was detained as a six-week-old. As noted above, P.L. and S.L. reunified with mother only briefly, for less than two months, between April and May 2023. Then at mother's request, on May 31, 2023, both girls were re-detained and returned to their prior foster placement with their now-prospective adoptive parents. They have remained in this placement since. At the time of the section 366.26 hearing, P.L. was five years old and S.L. was three years old.

The record reflects that P.L. and S.L. recognize mother as their mother and view her positively. They are excited to see mother, enjoy visiting her, and have shown affection toward her during their visits, such as by speaking to her positively and hugging her. Mother reciprocates the girls' affection, expressing her love toward them, soothing them when they cry, hugging them, and kissing them. But while positive, these interactions are insufficient to establish the parental benefit exception. (*In re*

---

grandmother self-serving and not credible . . . ." On substantial evidence review, "an appellate court does not evaluate the credibility of the witnesses or otherwise reweigh the evidence. [Citation.] Rather, 'we defer to the trier of fact on issues of credibility.' [Citation.]" (*Gresiman v. FCA US, LLC* (2024) 103 Cal.App.5th 1310, 1322.)

7

*C.F.*, *supra*, 193 Cal.App.4th at p. 555; *In re G.H.*, *supra*, 84 Cal.App.5th at p. 25.)

During observed visits with mother, P.L. and S.L. were fairly independent and often wandered off or ran away from mother. S.L. soothed herself, sought emotional support from her siblings, and did not look for mother. The girls tended to play with one another and only interacted with mother briefly, when she tried to engage them in structured activities. When visits ended, P.L. and S.L. did not exhibit any difficulty or distress in separating from mother. Indeed, S.L. was happy to see her foster parents upon returning from visits with mother.

Moreover, during these visits and while living with mother briefly in 2023, P.L. and S.L. did not accept mother's authority. They did not comply when mother raised her voice. Instead, in response to mother's efforts to redirect them, P.L. and S.L. escalated their behaviors. For example, P.L. whined, cried, threw tantrums, and yelled at mother when mother attempted to hold boundaries with her. Due to her inability to regulate the girls' behavior, mother often grew frustrated, irritable, and overwhelmed while they were in her care. She often had to remove herself to calm down.

Mother argues that in evaluating the second element of the *Caden C.* test, we cannot consider evidence regarding her difficulty managing the girls' behavior because it was one of the issues giving rise to dependency in the first place. This argument misreads *Caden C.*

In *Caden C.*, our Supreme Court held that "[a] parent's continued struggles with the issues leading to dependency are not a categorical bar to applying the [parental benefit] exception." (*Caden C.*, *supra*, 11 Cal.5th at pp. 637.) Likewise, a parent's

8

ability to regain custody of their children "is not, by itself, relevant to the application of the parental-benefit exception." (*Id.* at p. 638.) But the court noted that the persistence of the "issues . . . that led to dependency often prove relevant to the application of the exception," in that the parent's continued struggles can negatively affect their interactions with their children and limit the strength of the bond between them. (*Id.* at p. 637.)

Applying the latter principle here, we observe mother's inability to regulate the girls' behavior may offer explanation for, and evidence of, the lack of a strong emotional connection between her and the girls.[5] Thus, under *Caden C.*, the juvenile court did not err in considering this evidence for such purpose.

The girls' reactions to missed visits with mother also illustrate a limited emotional bond with her. For example, the girls did not experience any behavioral or emotional challenges when mother relocated to Arizona for a few months in 2021 and visits became both sporadic and virtual. Nor did the girls appear to suffer emotionally when mother cancelled visits due to illness, had no contact with them during a two-week trip to Massachusetts between December 2021 and January 2022, and cancelled all of her visits in June 2024.

Likewise, P.L. and S.L. did not exhibit significant distress when they were re-detained at mother's request after living with her for nearly two months. A few days after returning to foster care, P.L. did ask about mother, indicating she missed her. Over the next few months, P.L. also asked her caregivers why she

---

5   Mother's difficulty in managing the girls during visits in all likelihood also hijacked the visits as opportunities for her to bond further with them.

9

could not go to mother's house.  But overall, the girls readjusted smoothly to their caregivers' home.

Accordingly, viewed in the light most favorable to the juvenile court's findings (see *In re I.J.* (2013) 56 Cal.4th 766, 773), there is substantial evidence that although P.L. and S.L. enjoyed their visits with mother, they do not "ha[ve] a substantial, positive, emotional attachment to [her] . . . implying that [they] would benefit from continuing [their] relationship" with her.  (*Caden C.*, *supra*, 11 Cal.5th at p. 636.)  Thus, we find the juvenile court did not err in concluding mother did not satisfy the second element of the *Caden C.* test.

Lastly, we find the juvenile court did not err in finding mother failed to establish the third element of the parental benefit exception.  P.L. and S.L. have resided with their prospective adoptive parents, Ms. A. and Mr. G., for most of their lives.  P.L. was placed in their care upon her initial detention in July 2020, when she was 18 months old.  S.L. joined her in November 2020, when she was six weeks old.  In December 2021, both girls were placed with a different foster family.  But they were returned to Ms. A. and Mr. G. in April 2022, where they remained until reunifying with mother in April 2023.  During the two-month reunification period, Ms. A. and Mr. G. supported mother, offering to care for the girls as needed.  Upon their re-detention from mother in May 2023, the girls returned to Ms. A. and Mr. G. and have resided with them since.

P.L. and S.L. are thriving in the care of Ms. A. and Mr. G., who provide them with structure and ensure their needs are met. The girls have responded well to their caregivers' routines and expectations.  They are also affectionate with Ms. A. and Mr. G., from whom they seek emotional support and comfort.  P.L. refers

to Ms. A. and Mr. G. as "grandma" and "grandpa," respectively, "because she has heard their grandchildren call them by these names." S.L. refers to Ms. A. as "momma" and to Mr. G. as "poppa." P.L. has reported that she is happy in her placement. Moreover, DCFS observed that P.L.'s and S.L.'s history of "challenging behaviors, such as fighting amongst each other, aggression toward others, and difficulty managing emotions appear[ed] to have a direct correlation to their history of inconsistent caregiving." Given the above evidence, we find the juvenile court did not err in concluding that P.L. and S.L. will derive significant benefits if adopted by Ms. A. and Mr. G.

At the same time, the record indicates that P.L. and S.L. would suffer little negative consequences if their relationship with mother is terminated. (See *Caden C.*, *supra*, 11 Cal.5th at p. 633 [noting negative "effects might include emotional instability and preoccupation leading to acting out, difficulties in school, insomnia, anxiety, or depression"].) As set forth above, there is substantial evidence in the record to show that P.L. and S.L. did not exhibit significant distress when visits with mother ended or were cancelled. Nor did they experience any significant emotional or behavioral challenges following their re-detention from mother and return to Ms. A. and Mr. G.

Accordingly, on the record before us, we conclude the juvenile court did not abuse its discretion in determining that "any benefit accruing to [P.L. and S.L.] from [their respective] relationship with [mother] is outweighed by the physical and emotional benefit [each] child w[ould] receive through the permanency and stability of adoption . . . ." (See *Caden C.*, *supra*, 11 Cal.5th at p. 633.) Thus, the court did not abuse its discretion

11

by finding that mother failed to satisfy the third element of the *Caden C.* test.

In sum, for the reasons discussed above, the juvenile court did not err by finding the parental benefit exception to adoption inapplicable in mother's case.

## II.    Sibling Relationship Exception

### A.    Governing Principles and Standard of Review

A two-step analysis governs the application of the sibling relationship exception to adoption under section 366.26, subdivision (c)(1)(B)(v).  First, "the parent must show the existence of a significant sibling relationship, the severance of which would be detrimental to the child.  Many siblings have a relationship with each other, but would not suffer detriment if that relationship ended.  If the relationship is not sufficiently significant to cause detriment on termination, there is no substantial interference with that relationship." (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 952 (*L.Y.L*), fn. omitted.)  To determine the significance of the sibling relationship, the juvenile court must "evaluat[e] the nature and extent of the relationship" by considering, among other things, "whether the child and sibling were raised in the same house, shared significant common experiences[,] or have existing close and strong bonds." (*Ibid*; § 366.26, subd. (c)(1)(B)(v).)

Second, "[i]f the court determines terminating parental rights would substantially interfere with the sibling relationship, the court is then directed to weigh the child's best interest in continuing that sibling relationship against the benefit the child would receive by the permanency of adoption." (*L.Y.L*, *supra*, 101 Cal.App.4th at p. 952; § 366.26, subd. (c)(1)(B)(v).)

"The sibling bond exception is evaluated from the perspective of the child who is being considered for adoption, not the perspective of that child's siblings." (*In re D.O., supra*, 247 Cal.App.4th at p. 174.) "[T]he application of this exception will be rare, particularly when the proceedings concern young children whose needs for a competent, caring[,] and stable parent are paramount." (*In re Valerie A.* (2007) 152 Cal.App.4th 987, 1014.)

"We apply the substantial evidence standard of review to review the [juvenile] court's factual findings regarding the applicability of the sibling relationship exception, 'and the abuse of discretion standard to the court's weighing of competing interests.'" (*In re Isaiah S.* (2016) 5 Cal.App.5th 428, 438.)

### B.    Analysis

In concluding the sibling relationship exception did not apply based on the girls' relationship with their brothers, I.L. and O.L., the juvenile court first found that the evidence demonstrated the children "[we]re affectionate with each other, but there is no showing of a strong bond." The court then found that, even if P.L. and S.L. had a "substantial bond" with their brothers, "the benefit of permanency outweighs any possible disruption" of their relationship. We conclude the juvenile court did not err in either finding.

With respect to the first step of the analysis, the record contains substantial evidence demonstrating that P.L. and S.L. did not share a significant relationship with their brothers. The girls have lived apart from their brothers for most of their lives and have limited shared experiences with them. I.L., O.L., and P.L. were initially detained in July 2020, before S.L. was born, and when P.L. was only 18 months old. Two months later, the boys were separated from P.L. and placed in a different home due

13

to their aggressive behavior.  Then, upon her detention at six weeks of age in November 2020, S.L. was placed with P.L.  The four children did not live together until April 2023, when they were all reunified with mother.  Less than two months later, however, they were re-detained by DCFS.  Once again, the boys were separated from the girls, and all four children returned to their prior, respective placements.  Since then, the children have had weekly monitored visits together with mother on weekends.

S.L. is still too young to provide a meaningful statement about her relationship with her brothers.  But her older siblings' statements illustrate that the girls do not have a close relationship with the boys.  The girls have not expressed a desire to live with their brothers or visit them more often.  The girls' caregiver reported that they understand that they see their brothers on Sundays but do not ask for the boys during the week.  P.L. related that she likes to see her brothers because she gets to eat snacks with them, but that I.L. is mean, as he hits her and does not share his toys or food.  Similarly, the boys' caregiver reported that they do not mention their sisters at home.

The four children's interactions with one another similarly indicate that P.L. and S.L. do not have a significant relationship with their brothers.  While the children were excited to see each other during observed visits, the girls tended to play with one another, while the boys engaged in their own activities.  Moreover, during visits, and the brief time they lived together, the children often fought and were physically aggressive with one another.[6]  Indeed, at the section 366.26 hearing, P.L. testified

---

6      For example, the record reflects that (1) I.L. and O.L. have reported that P.L. pinches and scratches them; (2) mother has expressed that P.L. triggers O.L., provoking him into being

14

that she does not play with her brothers during visits because they hit her. The girls' history of aggressive interactions with I.L. and O.L. reflects the quality of their relationship. (See *In re Isaiah S.*, *supra*, 5 Cal.App.5th at p. 439.)

The girls' reaction to separating from their brothers reflects the lack of a significant relationship between them. When visits end, P.L. and S.L. leave promptly with their caregiver, sometimes requiring a reminder to say good-bye and to hug their brothers. P.L. and S.L. did not show distress when, after living with their brothers for nearly two months, they were separated on May 31, 2023 due to re-detention. Instead, the girls "adapted well to the change of homes."

Viewed in the light most favorable to the juvenile court's findings (*In re I.J.*, *supra*, 56 Cal.4th at p. 773), the evidence establishes that P.L. and S.L. did not have "a significant sibling relationship, the severance of which would be detrimental to the [girls]." (*L.Y.L.*, *supra*, 101 Cal.App.4th at p. 952, fn. omitted.) Thus, the court did not err in finding that the first part of the sibling relationship exception test had not been satisfied.

Moreover, even if mother had satisfied the first part of the test by showing a significant sibling relationship, the juvenile court did not abuse its discretion by finding she failed to meet the second part of the test. At the time of the section 366.26 hearing, P.L. and S.L. were five years old and three years old, respectively. Therefore, as "young children[,] . . . [their] needs for

---

aggressive with her; (3) in early May 2023, P.L. reported that S.L. hit I.L. after he bit P.L.; (4) during a visit in October 2023, O.L. pushed P.L.; and (5) in November 2023, the girls' caregiver reported that "[i]t was clear the boys would fight with the girls, and amongst each other."

15

a competent, caring[,] and stable parent are paramount." (*In Valerie A.*, *supra*, 152 Cal.App.4th at p. 1014.) As discussed above, the evidence shows that the girls would derive significant benefits if adopted by their caregivers. (See Discussion Part I.B., *infra*). Given the girls' limited emotional relationship and history of physical aggression with their brothers, the juvenile court did not abuse its discretion in finding that the benefits P.L. and S.L. would gain from adoption outweigh those that they would receive from continuing their relationship with I.L. and O.L.

In sum, for the reasons discussed above, the juvenile court did not err in finding the sibling relationship exception inapplicable.

## III. Juvenile Court's Consideration of Bonding Study

Finally, mother argues that the juvenile court committed reversible error by being "unclear in its ruling whether, or to what extent, it was considering the bonding study performed by Dr. [Ronald] Banks." (Capitalized and bolded text omitted.) Mother asserts: "Where the trial court has contradicted itself in terms of what evidence it has considered, it is impossible on review to determine whether there was substantial evidence to support the trial court's decision."

We reject this argument because it misapprehends the nature of substantial evidence review. Contrary to mother's contention, we need not discern the actual evidence on which the juvenile court relied in making its findings. Instead, we must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence such that a reasonable trier of fact could have made those findings. (*In re I.J., supra*, 56 Cal.4th at p. 773.)

16

## DISPOSITION

The order terminating parental rights is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

GARCIA UHRIG, J.*

We concur:

ZUKIN, P.J.

MORI, J.

---

* Judge of the Los Angeles Superior Court assigned by the Chief Justice pursuant to article IV, section 6 of the California Constitution.

17